Jaclyn SANTOMENNO; Karen Poley; Barbara Poley, Plaintiff,

v.

TRANSAMERICA LIFE INSURANCE COMPANY; Transamerica Investment Management, LLC; Transamerica Asset Management Inc., Defendants.

Case No. CV 12–02782 DDP (MANx)

United States District Court, C.D. California.

Signed March 14, 2016

Arnold Carl Lakind, Robert E. Lytle, Mark A. Fisher, Robert Gannon Stevens, Jr., Szaferman Lakind Blumstein Blader and Lehmann PC, Daniel S. Sweetser, Robert L. Lakind, Stephen Skillman, Szaferman Lakind Blumstein and Blader PC, Lawrenceville,

NJ, Havila C. Unrein, Khesraw Karmand, Juli E. Farris, Keller Rohrback LLP, Santa Barbara, CA, Derek W. Loeser, Gretchen S. Obrist, Lynn L. Sarko, Michael D. Woerner, Keller Rohrback LLP, Seattle, WA, for Plaintiff.

Thomas R. Curtin, George C. Jones, Graham Curtin PA, Morristown, NJ, Brian David Boyle, Robert N. Eccles, Shannon M. Barrett, O'Melveny and Myers LLP, Theresa S. Gee, Miller & Chevalier Chartered, Washington, DC, Catalina J. Vergara, O'Melveny & Myers, Christopher Brendan Craig, Stella Dahye Kim, O'Melveny and Meyers LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING SECOND MOTION TO CERTIFY CLASS

DEAN D. PREGERSON, United States District Judge

Presently before the Court is Plaintiffs' Second Motion for Class Certification, brought under Federal Rule of Civil Procedure 23(b)(3). (Dkt. No. 358.) Having considered the parties' submissions and heard oral argument, the Court adopts the following Order.

## I. BACKGROUND

The facts of this case are taken from the Court's previous Order denying class certification. (Dkt. No. 354.) New facts and procedural history follow.

### A. Statement of Facts from Order Denying First Motion for Class Certification

Transamerica Life Insurance Company ("TLIC") sells a 401(k) plan product targeted at small and mid-size employers. (Compl. ¶¶ 62, 94.) The product consists of a bundle of investment options and administrative services that an employer can purchase. (Id. ¶ 7.)

Plaintiffs and potential class members are the retirement "plans" that used these TLIC products and people who are or were participants in or beneficiaries of the plans. (Mot. Class Cert., dkt. no. 277, § III.) Plaintiffs allege that the fees they were charged for these products were excessive, in violation of the Employee Retirement Income Security Act ("ERISA"). (Compl. ¶ 1.)

Employers who purchase the 401(k) plan product enter into a group annuity contract ("GAC" or "the contract") with TLIC.[1] (See Decl. Darcy Hatton ISO Def.'s Mot. Dismiss, Exs. D–1 and D–2.) Through the GAC, TLIC provides a set of investment options to the employer. Plaintiffs' employers selected the "Partner Series III" retirement package. (Compl. ¶ 243.) This package gives employers 170 investment options, from which the employer may select a smaller number to offer to their employees. (Id. ¶¶ 241–42.) The 401(k) plan sponsored by the former employer of Plaintiff Santomenno, the Gain Capital Group, LLC 401(k) Plan (the "Gain Plan"), selected 46 of 170 investment options. (Id. ¶¶ 17, 206–08.) The plan sponsored by the employer of Plaintiffs Karen and Barbara Poley, the QualCare Alliance Networks, Inc. Retirement Plan (the "QualCare Plan"), selected 36 of 170 investment options. (Id. ¶¶ 16, 206–08.)

One of the benefits TLIC provides to client employers is the "Fiduciary Warranty." (Id. ¶ 155.) Having entered into a GAC, an employer may pick and choose from the investment options à la carte, or it may choose one of TLIC's pre-selected "model" line-ups. (Id. ¶ 157.) If an employer chooses a model line-up, the employer qualifies for TLIC's Fiduciary Warranty, which "provides specific assurances" that the line-up will satisfy ERISA's "broad range of investments" requirement and its "prudent man standards." (Id.) TLIC warrants that if employees assert a claim for breach of those fiduciary duties against the employer, TLIC will indemnify the employer and make the plan whole. (Id. ¶ 159.) TLIC's Fiduciary Warranty applies when an employer constructs its own line-up

---

1. The employer and TLIC also enter into an "Application and Agreement for Services" ("Services Agreement"), which sets out the various services TLIC agrees to provide for the employer's plan, including recordkeeping services, enrollment services, and website hosting. (See, e.g., Decl. Darcy Hatton ISO Def.'s Mot. Dismiss, Ex. A.) Plaintiffs do not challenge fees associated with the Services Agreements.

only if the employer selects investments from specified categories. (*Id.* ¶ 157.)

TLIC structures its investment product under the GAC such that each investment option is considered a "separate account." (*Id.* ¶ 132.) Each separate account corresponds to an underlying investment: a mutual fund, a collective trust, or a traditional separate account. (*Id.* ¶ 130.) In each separate account, TLIC pools together the retirement assets of all employees who choose a certain investment option, regardless of their employer. (*Id.*) Many of the mutual funds are publicly traded and managed by investment managers unaffiliated with TLIC such as Fidelity or Vanguard. (*See, e.g., id.* ¶ 214.) Some of the mutual funds and collective trusts are managed by Transamerica Investment Management, LLC ("TIM") or Transamerica Asset Management, Inc. ("TAM"), affiliates of TLIC. (*Id.* ¶ 340.)

TLIC assesses fees for most accounts. The GAC specifies that there are Investment Management Charges and Administrative Management Charges ("IM/Admin Fee") associated with each separate account, which "may be withdrawn daily and will belong to [TLIC]." (Hatton Decl., Ex. D–1.) These fees are a percentage of the assets in the separate account, and the rate varies depending on which separate account is in question. (Hatton Decl., Exs. D–1 and D–2.) Thus, the IM/Admin Fee is not plan-specific, but investment-specific; it is charged uniformly to each separate account, regardless of plan. (Decl. Robert Lakind, Ex. P at 21–23 (deposition testimony of Eric King, VP of TLIC's Investment Solutions Group).) The GAC provides a schedule of fees for each of the separate accounts but reserves the "right to change the Investment Management Charge or the Administrative Charge upon advance written notice to the Contractholder of at least 30 days." (Hatton Decl., Ex. D–1.)

Plaintiff alleges that for separate account investment options invested in mutual funds, TLIC's fees are approximately 75 basis points, or 0.75% of the Plan assets invested in each option. (*Id.* ¶ 271.) For at least 28 of the mutual fund options, plan participants pay the fee charged by the mutual fund in addition to a higher fee charged by TLIC.

(*Id.* ¶¶ 245, 248.) For instance, for the separate account that invests in the Vanguard Total Stock Market Index Ret Opt, the underlying mutual fund charged a fee of 18 basis points and TLIC charged an additional account fee of 93 basis points, for a total fee of 111 basis points or 1.11% of the separate account assets. (*Id.* ¶ 246.) For separate account investment options invested in collective trusts, TLIC charged a fee ranging from 79 basis points to 150 basis points. (*Id.* ¶¶ 331, 333–34.)

In their complaint, Plaintiffs alleged that Defendants' fees are excessive and are a breach of Defendants' fiduciary duty to Plaintiffs under ERISA. More specifically, Plaintiffs alleged that TLIC's fees on separate accounts that invest in publicly available mutual funds are excessive because TLIC provides no services on such accounts: the underlying mutual funds' investment management fees covered "all of the necessary investment management/advisory services needed for the mutual fund," and thus "the alleged management services performed by TLIC were unnecessary or simply not performed." (Compl. ¶ 276.) As a result, Plaintiffs argued, the fees they paid to TLIC were "excessive and unnecessary." (*Id.*) "The charging of any fees by TLIC to Plaintiffs that are in excess of the fees charged by each of the mutual funds that underlie the overlaying separate account is impermissible." (*Id.* ¶ 293.)

Plaintiffs further alleged that TLIC has not used its institutional leverage to invest their money in the lowest price share class of mutual funds. (*Id.* ¶ 314.) This, Plaintiffs alleged, was a breach of TLIC's fiduciary duty under ERISA. (*Id.* ¶ 314.)

Plaintiffs also alleged that TLIC affiliates TIM and TAM made transactions that are prohibited under ERISA and knowingly participated in TLIC's violations of fiduciary duty. (*Id.* Count IV.)

**B. Second Class Certification Motion**

In Plaintiffs' Second Motion for Class Certification, Plaintiffs note that there are two categories of fees at issue: separate account-level fees and plan-level fees. (Second Mot.

to Certify Class, dkt. no. 358, at 3 ("Mot.").) The IM/Admin fees are separate account-level fees, as are fees billed by underlying mutual funds. (*Id.*) The plan-level fees are the Contract Asset Charge ("CAC") paid by participants and the service fees collected under the Service Agreement. (*Id.*) Plaintiffs' experts opine that TLIC's service fees under the Service Agreement "are adequate and reasonable," and so Plaintiffs do not challenge TLIC's service fees. (*Id.* at 3, 5.)

The CAC fees pay for "plan-level (a) 'sales, marketing and administrative expenses of the contract' (Dec. RL, Ex. 10, p. 5), (b) commissions (Dec. RL, Ex. 4, TRAN–540496), which are passed through to the broker (Dec. RL, Ex. 6, pp. 23–24) and (c) discontinuance charges that may be paid to the plan's prior service provider, which TLIC refers to as an 'asset bridge' or 'MVE.' (Dec. RL Ex. 11, p. 16)." (*Id.* at 4.) Some of these fees, such as the commissions for the broker, are pass-through fees and are not challenged by Plaintiffs. (*Id.* at 5.)

The dispute, Plaintiffs explain, is whether the IM/Admin fees "subsidize plan-level fees" and thus make the total fees excessive. (*Id.* at 4.) This total fee argument is in response to the Court's prior Order denying class certification. In that Order, the Court held that "if Plaintiffs wish to assert a claim under TLIC's fiduciary duty to defray only reasonable expenses, they must do so by considering TLIC's fees as a whole compared to TLIC's total reasonable expenses in providing its services." (Order, dkt. no. 354, at 30–31.)

Plaintiffs' Motion seeks to certify three classes, modified since the Court's prior Order. First is the "TLIC Prohibited Transaction Class" that alleges "TLIC committed ERISA prohibited transactions under 29 U.S.C. § 1106(b)(1) (self-dealing) because TLIC unlawfully paid itself from plan assets over which it was a fiduciary." (Mot. at 6.) Second is the "TLIC Excessive Fee Class" that "seeks to prosecute three claims: the claim that, as a consequence of its excessive fee, TLIC breached (1) its duty of loyalty, to act 'solely in the interest of participants and beneficiaries,' 29 U.S.C. § 1104(a)(1)(A); (2) its duty to defray only reasonable expenses,

29 U.S.C. § 1104(a)(1)(A)(ii); and (3) its duty of prudence, 29 U.S.C. § 1104(a)(1)(B)." (Mot. at 6.)

Third is the "TIM and TAM Class" that has two claims: first, "that TLIC committed a prohibited transaction under 29 U.S.C. § 1106(b)(1) and (2) (self-dealing and acting on behalf of or representing a party whose interests are adverse to the plan) by allowing plan assets to be invested in Ret Opt investment choices that were managed for a fee by TLIC affiliates"; and second, that "TLIC breached its three duties under 29 U.S.C. § 1104(a)(1)(A), (A)(ii), and (B) as described above, by allowing TIM and TAM to charge excessive fees on plan assets invested in the Affiliated Separate Accounts." (Mot. at 6.) Specifically, Plaintiffs argue that TIM and TAM charged TLIC investors higher fees than "TAM charged to others with whom it bargained at arm's length for the same services." (*Id.*)

Plaintiffs explain that the TLIC Prohibited Transaction Class and one of the claims for the TIM and TAM Class "allege 'per se' ERISA prohibited transaction claims," where reasonableness is not a defense. (*Id.*) Reasonableness is central to the TLIC Excessive Fee Class and claim two of the TIM and TAM Class because Plaintiffs must prove that the fees were excessive. (*Id.*)

Plaintiffs further explain that the changes Plaintiffs have made to this motion address the Court's concerns in the prior Order. (*Id.* at 6–8.) Plaintiffs now seek partial certification of the TIM and TAM prohibited transaction claim, produce evidence regarding commonality, and explain the legal basis of the prohibited transaction claim. (*See* Order, Dkt. No. 354, at 18–20, 35 n.8.) Further, Plaintiffs are not focused solely on the uniform investment-level Separate Account IM/Admin fee of each Ret Opt, as they were in their prior Motion. (Mot. at 7.) Instead, Plaintiffs "redefin[ed] the TLIC Excessive Fee Class to limit the class to plans in which plan-level costs are either unsubsidized or which require subsidization, but even after accounting for the subsidy, the balance of the IM/Admin is still excessive." (*Id.* at 7–8.)

## C. Procedural History

This Court denied Plaintiffs' first Motion for Class Certification on August 28, 2015. (Dkt. No. 354.) On October 15, 2015, the parties filed a Stipulation Regarding Briefing Schedule and Length of Parties' Second Class Certification Briefs. (Dkt. No. 355.) In a footnote, the stipulation states that "Defendants reserve all objections with respect to Plaintiffs' intended Second Motion for Class Certification, including that it is procedurally improper." (*Id.* at 2 n.1.) The Court granted the stipulation in its Order on October 27, 2015. (Dkt. No. 357.) Then, Plaintiffs filed their second Motion to Certify Class on October 28, 2015. (Dkt. No. 358.) The next day, Defendants filed an Ex Parte Application to Expedite Motion to Strike Plaintiffs' Second Motion for Class Certification, which this Court denied in a Minute Order. (Dkt.Nos.361, 362.) On October 30, 2015, Defendants filed an Ex Parte Application to Strike Plaintiffs' Second Motion for Class Certification. (Dkt. No. 363.) The Court directed Plaintiffs to file a responsive brief, which Plaintiffs did on November 16, 2015. (Dkt.Nos.364, 365.)

Defendants had three primary arguments in their Ex Parte application for why the Court should strike the Second Motion for Class Certification: (1) Plaintiffs should have filed an interlocutory appeal of the Court's previous Order denying class certification; (2) Plaintiffs' motion is really a Motion for Reconsideration but there is no legal basis for such a motion; and (3) the Second Class Motion is untimely under the Court's scheduling order. (Ex Parte, dkt. no. 363, at 1.)

Plaintiffs responded by arguing that they understood any objections to the second class motion would be dealt with in Defendants' opposition to the class certification motion. (Ex Parte Opp'n, dkt. no. 365, at 1.) According to Plaintiffs, the briefing schedule and page limits were agreed upon by the parties and approved by the Court before Plaintiffs filed their successive motion; thus, Defendants' Ex Parte was the wrong place to air procedural disagreements. (*Id.*) Plaintiffs also argued that their successive motion is acceptable under the Federal Rules of Civil Procedure, part of an amended scheduling order pursuant to the stipulation, and not a motion for reconsideration. (*Id.* at 3–10.) The Court denied Defendants' Ex Parte in a Minute Order, stating that "Defendants' arguments should be raised in opposition to Plaintiffs' second class certification motion rather than in the extreme remedy of an ex parte motion to strike." (Dkt. No. 367.) After regular briefing concluded, Defendants filed a Notice of Supplemental Authority, responded to by Plaintiffs. (Dkt.Nos.377, 379.) Then, Defendants filed an Ex Parte for leave to file an additional brief as a sur-reply to Plaintiffs, which the Court granted. (Dkt.Nos.380, 381.)

At the second class certification motion hearing, Plaintiffs withdrew without prejudice their motion to certify the TLIC excessive fee class. The Court also ordered the parties to provide supplemental briefing as to Plaintiffs' proposed prohibited transaction classes, particularly as Defendants raised new issues and defenses to that claim in Defendants' supplemental briefing. (Dkt.Nos.385, 388.)

## II. LEGAL STANDARD

The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met. *See Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1041 (9th Cir.2012); *Hanon v. Dataprods. Corp.,* 976 F.2d 497, 508–09 (9th Cir.1992). In determining whether to certify a class, a court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1233 (9th Cir.1996). Rule 23(a) sets forth four prerequisites for class certification:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see also Hanon,* 976 F.2d at 508. These four requirements are often referred to as numerosity, commonality, typicality, and adequacy. *See Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

▪ In determining the propriety of a class action, the question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The court considers the merits of the underlying claim to the extent that the merits overlap with the Rule 23(a) requirements, but does not conduct a "mini-trial" or determine at this stage whether plaintiffs could actually prevail. *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 981, 983 n. 8 (9th Cir.2011); *see also Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374 (2011).

Rule 23(b) defines different types of classes. *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 512 (9th Cir.2013). Relevant here, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over individual questions ... and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

## III. DISCUSSION

▪ As an initial note, the Court holds that the Second Motion to Certify Class is not procedurally improper. In their Opposition, Defendants repeated essentially the same arguments raised in their Ex Parte Motion, which this Court previously denied. (*See* Opp'n at 30 ("incorporating by reference" the arguments in the Ex Parte application).) Defendants waited to file their objections to the successive class motion until right after Plaintiffs filed their motion, and Defendants did not raise their objections in the meet and confer with Plaintiffs. Further, by entering into the stipulation with Plaintiffs without providing Plaintiffs with their objections other than to "reserve" them

in a footnote, Defendants essentially agreed to a modification of the Scheduling Order, which this Court ratified in its Order granting the stipulation. (*See* Dkt. No. 357.)

Lastly, courts frequently allow successive class certification motions where a previous motion is denied but there is a colorable claim that could be classified because courts have "broad discretion" in revisiting class certification before final judgment. *See, e.g., Hartman v. United Bank Card, Inc.,* 291 F.R.D. 591, 597 (W.D.Wash.2013)(collecting cases and noting that usually a change in circumstances is the basis for a reconsideration of an original class ruling). Plaintiffs here claim that they present new facts and legal theory in this "significantly" different class certification motion. (Dkt. No. 372–13, Reply at 25 (incorporating by reference the arguments in Plaintiffs' response to the Ex Parte.) Therefore, the Court will address the motion on the merits.

### A. Rule 23(a) Requirements
#### 1. Numerosity

Numerosity is satisfied when "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Although there is no minimum number of class members below which numerosity cannot be satisfied per se, the Supreme Court has held that a class of fifteen was too small. *Gen. Tel. Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). In addition, courts have held that a class of 40 or more members will generally satisfy the numerosity requirement. *See EEOC v. Kovacevich "5" Farms,* No. CV–F–06–165, 2007 WL 1174444, at *21 (E.D.Cal. Apr. 19, 2007); *Ikonen v. Hartz Mountain Corp.,* 122 F.R.D. 258, 262 (S.D.Cal.1988). In general, " 'impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–14 (9th Cir.1964).

The Court's previous Order found that Plaintiffs' proposed class involved about "300,000 participants in about 7,400 plans," which satisfied the numerosity requirement. (Order, dkt. no. 354, at 7–8.) The numbers

are about the same in this second motion for the TLIC Prohibited Transaction class. (Mot. at 15.) For the TIM and TAM classes, Plaintiffs claim there are at least 6,000 members based on defense expert Dr. Strombom's report. (*Id.* citing Dec. RL, Ex. 12 (ex. 28(b)).) Defendants do not appear to dispute these numbers. (*See generally* Opp'n.) Therefore, the Court holds this factor is satisfied.

## 2. Commonality

■ Commonality is satisfied if "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). However, "[t]he requirements of Rule 23(a)(2) have been construed permissively, and all questions of fact and law need not be common to satisfy the rule." *Ellis,* 657 F.3d at 981 (internal quotation marks and brackets omitted). However, merely showing that there are common questions of fact is not enough; the questions must be ones that will "generate common answers apt to drive the resolution of the litigation." *Dukes,* 131 S.Ct. at 2551 (internal quotation omitted).

### a. TLIC's Fiduciary Status

In the ERISA context, "a person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(I). A fiduciary is also a person with "any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(iii). "In every case charging breach of ERISA fiduciary duty ... the threshold question is ... whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

The Court determined that TLIC's fiduciary status is a question common to the previous class. (Order, dkt. no. 354, at 8–15.) There, the Court analyzed in detail fiduciary duty as to Plaintiffs' claim of excessive fees

as well as to other actions by TLIC, such as not investing in lowest-cost share classes and other fee collection actions. (*Id.*)

■ Fiduciary status and the incorporated duties that come with that status are elements common to the current classes as well. (Mot. at 15–16.) Defendants do not reargue their contention that they are not fiduciaries other than to preserve their claim. (*See* Opp'n at 10 n.8, 25 n.19.) Therefore, the Court holds that the same analysis from the previous Order applies here, and the question of TLIC's fiduciary status and duties is common among all the classes.

### b. Other Common Questions

In the previous Order, the Court held that there were also common questions as to separate account and investment-level fees, although the Court acknowledged that commonality may be defeated by an examination of the total fees. (Order, dkt. no. 354, at 15–18 & n.4.) Further, the Court noted that Defendants raised a defense based on the total fees being reasonable, particularly for individual plans, but the Court held these arguments were "more properly addressed in the predominance analysis under Rule 23(b)(3)." (*Id.* at 18.)

In the current Motion, Plaintiffs argue that for the TLIC Prohibited Transaction class, Plaintiffs must show that TLIC was a fiduciary and that by taking the IM/Admin fees from the assets over which TLIC was a fiduciary, TLIC committed a per se prohibited transaction under 29 U.S.C. § 1106(b). (Mot. at 15–16.) Because the IM/Admin fees are collected at the separate account level, Plaintiffs argue "there are no issues unique to any plan." (*Id.* at 16.)

Plaintiffs bring the TIM and TAM class claims under 29 U.S.C. § 1106(b)(1) and (2) for the prohibited transaction claim and 29 U.S.C. § 1104(a)(1)(A), (a)(1)(A)(ii), and (a)(1)(B) for the excessive fee claim. Thus, Plaintiffs argue that the relevant questions are whether TLIC is a fiduciary, whether TLIC breached its duties by allowing TIM and TAM to charge the class higher fees than TAM charged third parties for the same service, whether that higher fee charged was

excessive, and whether TIM and TAM "participate[d] in TLIC's fiduciary breaches," and Plaintiffs claim that there is common proof underlying these common questions. (*Id.* )

Defendants had contested TLIC's fiduciary status, as well as other issues of commonality under Rule 23(a), in their Opposition to the previous class certification motion. (*See* Opp'n at 10 n.8; Opp'n to First Class Certification, dkt. no. 300, at 9–26.) Defendants do not address commonality in this current Opposition, but do note that the Court previously rejected Defendants' arguments on this factor and instead considered the arguments under a predominance analysis, a decision Defendants urge the Court to reconsider. (Opp'n at 10 n.8.)

Based on the present record, the Court holds that, consistent with the Court's holding in the previous Order denying class certification, common questions of law and fact are present for both classes. Defendants' arguments about individual variation are more appropriate in a predominance analysis.

### 3. Typicality

■ Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). The Ninth Circuit explains the typicality requirement as revolving around a broad-based inquiry to ensure the interests of the class are the same as the interests of the named plaintiff:

> The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class. Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought. The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*Hanon*, 976 F.2d at 508 (internal quotation marks and citations omitted).

The Court's previous Order found typicality satisfied. (Order, dkt. no. 354, at 22–23.) Defendants raised two arguments against typicality: that the subsidization of plan fees was disclosed to participants after December 2011 and that fees vary by plan size. (*Id.* at 22.) The Court held these arguments did not make the Plaintiffs typical of the average case. The Court explained that defenses that are unique to class representatives are the main concern in a typicality analysis. So the concern is not that certain plans may have received disclosures, where the vast majority had not receive the disclosures. (*Id.* at 23.) Further, that fees vary in relation to the size of the plan relates to the potential differences in damages, not that the injuries suffered are different in kind. (*Id.* at 22–23.)

Now, Plaintiffs argue that "[b]oth Plaintiff plans and all three lead Plaintiffs invested in a variety of TLIC Ret Opt choices which pay an IM/Admin Fee to TLIC that form the basis for the claim of the TLIC Prohibited Transaction Class." (Mot. at 17 citing Dec. RL ¶¶ 6–8.) This is typical of the class because "TLIC paid its IM/Admin Fee from plan assets for all plans." (*Id.* ) Further, Plaintiffs allege that both the Plaintiff plans and the named Plaintiffs invested in TIM and TAM managed funds; thus, their claims are typical of the TIM and TAM class.

Defendants respond that Plaintiffs' new theories of the case fail typicality, but only substantively address the excessive fee class Plaintiffs withdrew without prejudice at oral argument. (Opp'n at 10–11; 22–23.) Defendants do not discuss the typicality of the TLIC Prohibited Transaction class or the TIM and TAM class, other than to note that the TIM and TAM class is the "excessive fee claim by another label." (*Id.* at 24 n.18.)

■ With Plaintiffs' facial satisfaction of the requirement, and without any real argument to the contrary, and the Court holds that the named Plaintiffs are typical of the TLIC Prohibited Transaction Class and the TIM and TAM Class.

### 4. Adequacy

Adequacy of representation is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Inasmuch as it is con-

ceptually distinct from commonality and typicality, this prerequisite is primarily concerned with "the competency of class counsel and conflicts of interest." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Thus, "courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis*, 657 F.3d at 985.

The Court previously found adequacy of representation satisfied. (Order at 24–25 & n.7.) The Court found no standing issues for the named Plaintiffs and no conflicts of interest based on other class members belonging to different plans. (*Id.*) Plaintiffs claim that there is nothing new to add to this analysis. (Mot. at 17–18.) Defendants also add nothing new beyond the arguments articulated above for typicality. Defendants still maintain there is a lack of standing. (Opp'n at 22–23 & n.16.) The Court holds that, consistent with the Court's prior Order, there are no adequacy issues here for any of the classes claimed.

## B. Rule 23(b) Requirements

### 1. Action Under Rule 23(b)(3)

A class action may be certified under Rule 23(b)(3) if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). In making findings on these two issues, courts may consider "the class members' interests in individually controlling the prosecution or defense of separate actions," "the extent and nature of any litigation concerning the controversy already begun by or against class members," "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and "the likely difficulties in managing a class action." *Id.*

### a. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "Even if Rule 23(a)'s commonality requirement may be satisfied by [a] shared experience, the predominance criterion is far more demanding." *Id.* at 623–24, 117 S.Ct. 2231. Predominance cannot be satisfied if there are many "significant questions peculiar to the several categories of class members, and to individuals within each category." *Id.* at 624, 117 S.Ct. 2231. However, Rule 23(b)(3) predominance "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, —— U.S. ——, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013).

The Court's previous Order denied class certification based on Plaintiffs' failure to satisfy the predominance requirement. (Order, dkt. no. 354, at 27–35.) The Court first noted that due to the potential size of the class ("300,00 participants in about 7,400 plans"), "individual inquiries potentially loom large" because "*any* difference in facts or legal posture among plans is potentially multiplied a thousandfold." (*Id.* at 27–28.) Defendants argued, and the Court agreed, that the problem with Plaintiffs' prior class definition was that it gave rise to individualized defenses that overwhelmed the common questions. (*Id.* at 28–29.)

The Court explained that "if Plaintiffs wish to assert a claim under TLIC's fiduciary duty to defray only reasonable expenses, they must do so by considering TLIC's fees as a whole compared to TLIC's total reasonable expenses in providing its services." (*Id.* at 30–31.) One of the Court's concerns was that the individual IM/Admin fee that Plaintiffs alleged was excessive could be subsidizing the plan-level expenses that Plaintiffs did not contest. (*See id.* at 31.) This concern led the Court find that "fees charged to individual plans must be compared to the expense of providing services to those plans" and that "[t]hese individualized inquiries

would be significantly more complex than Plaintiffs' proposed inquiry into a single fee whose reasonableness (Plaintiffs argue) could be straightforwardly determined as to all plans equally." (*Id.*)

In a footnote, the Court highlighted the option for partial class certification, but stated that Plaintiffs had neither requested partial certification nor provided sufficient legal basis for such potential classes. (*Id.* at 35 n.8.) For Plaintiffs' arguments about the TIM and TAM charges, the Court found the same predominance problems for excessive fee claims as the Court had found for the other TLIC charges. (*Id.*) The Court found that Plaintiffs' prohibited transaction claims lacked developed legal authority and was not briefed for partial certification. (*Id.*)

Now, Plaintiffs have asked the Court for full or partial class certification, and originally had three separately defined classes. However, at the motion hearing, Plaintiffs dropped their TLIC excessive fee class, so the Court will only discuss the two remaining classes.

### i. TLIC Prohibited Transaction Class

This class alleges violation of 29 U.S.C. § 1106(b)(1), which classifies self-dealing as a per se prohibited transaction: "A fiduciary with respect to a plan shall not—(1) deal with the assets of the plan in his own interest or for his own account." Plaintiffs argue that TLIC's practice of taking the IM/Admin fee from plan assets is such a prohibited transaction. (Mot. at 19.) For legal authority, Plaintiffs primarily rely on *Barboza v. California Ass'n of Professional Firefighters*, 799 F.3d 1257 (9th Cir.2015) (which came out as amended on the same day as the Court's previous Order, August 28, 2015), and *Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir.2001), discussed below.[2]

Defendants argue that *Barboza* does not provide a basis "to condemn longstanding 401(k) servicing arrangements in which fiduciaries withdraw from plan assets those fees that the plans' independent fiduciaries have agreed to in advance, and in which 401(k) platform providers like TLIC offer affiliated investment options alongside unaffiliated ones to their plan clients." (Opp'n at 25.) Defendants read *Barboza* narrowly, arguing that the prohibited transaction was "the service provider's failure to present evidence that the plan client had approved, in advance, the specific fees that the service provider opted to withdraw from plan accounts." (*Id.* (citing Brief of Sec'y Labor ISO Pl.—Appellant at 8 n.1, *Barboza*, 799 F.3d 1257 (filed Feb. 7, 2012).) Thus, Defendants argue that the analysis is actually one based on causation: "whether TLIC used any such fiduciary authority to cause the transactions that plaintiffs label 'prohibited.'" (*Id.* at 25–26.) Defendants say that if this Court accepts Plaintiffs' argument, then "service providers could never be paid out of plan assets, even with the agreement of independent fiduciaries on the precise amount of the fees to be deducted." (*Id.* at 28.) This, Defendants claim, "would stop defendants, and other 401(k) providers, from doing business altogether." (*Id.*)

Defendants further argue that TLIC is covered by several exceptions in the statute that excuse conduct that may otherwise be considered a prohibited transaction. (Opp'n at 28 (discussing fiduciary entitlement to reasonable fee); Dkt. No. 382, Def. Additional Brief, at 1–2 (29 U.S.C. § 1108(b)(8)); Dkt. No. 385, Def. Supp. Brief, at 1–7 (29 U.S.C. § 1108(b)(8), (c)(2)).)

First, the statutory language. As provided for in the U.S.Code, ERISA § 406, 29 U.S.C. § 1106, states:

---

**2.** Plaintiffs have also cited other cases approving the reasoning and holding in *Patelco* and *Barboza*: *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 750 (6th Cir. 2014); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 95 (3d Cir.2012); *Kanawi v. Bechtel Corp.*, 590 F.Supp.2d 1213, 1223 (N.D.Cal.2008); *LaScala v. Scrufari*, 96 F.Supp.2d 233, 239 (W.D.N.Y. 2000). (*See* Dkt. No. 388, Pl. Response, at 2–3 & n.1.)

§ 1106. Prohibited transactions

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

(b) Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

(c) Transfer of real or personal property to plan by party in interest

A transfer of real or personal property by a party in interest to a plan shall be treated as a sale or exchange if the property is subject to a mortgage or similar lien which the plan assumes or if it is subject to a mortgage or similar lien which a party-in-interest placed on the property within the 10-year period ending on the date of the transfer.

(Pub. L. 93-406, title I, § 406, Sept. 2, 1974, 88 Stat. 879.)

And the relevant portions of ERISA § 408, 29 U.S.C. 1108, state:[3]

§ 1108. Exemptions from prohibited transactions

(a) Grant of exemptions

The Secretary shall establish an exemption procedure for purposes of this subsection. Pursuant to such procedure, he may grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by sections 1106 and 1107(a) of this title. Action under this subsection may be taken only after consultation and coordination with the Secretary of the Treasury. An exemption granted under this section shall not relieve a fiduciary from any other applicable provision of this chapter. The Secretary may not grant an exemption under this subsection unless he finds that such exemption is—

(1) administratively feasible,

(2) in the interests of the plan and of its participants and beneficiaries, and

(3) protective of the rights of participants and beneficiaries of such plan.

Before granting an exemption under this subsection from section 1106(a) or 1107(a) of this title, the Secretary shall publish notice in the Federal Register of the pendency of the exemption, shall require that adequate notice be given to interested persons, and shall afford interested persons opportunity to present views. The Secretary may not grant an exemption under this subsection from section 1106(b) of this title unless he affords an opportunity for a hearing and makes a determination on the record with respect to the findings required by paragraphs (1), (2), and (3) of this subsection.

(b) Enumeration of transactions exempted from section 1106 prohibitions

The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:

(1) Any loans made by the plan to parties in interest who are participants or beneficiaries of the plan if such loans (A) are available to all such participants and beneficiaries on a

... ... ... ... ... ...

(8) Any transaction between a plan and (i) a common or collective trust fund or pooled investment fund maintained by a party in interest which is a bank or trust company supervised by a State or Federal agency or (ii) a pooled investment fund of an insurance company qualified to do business in a State, if—

(A) the transaction is a sale or purchase of an interest in the fund,

(B) the bank, trust company, or insurance company receives not more than reasonable compensation, and

(C) such transaction is expressly permitted by the instrument under which the plan is maintained, or by a fiduciary (other than the bank, trust company, or insurance company, or an affiliate thereof) who has authority to manage and control the assets of the plan.

(c) Fiduciary benefits and compensation not prohibited by section 1106

Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—

(1) receiving any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries;

(2) receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred; or

(3) serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest.

Plaintiffs bring class claims under § 1106(b)(1) for the TLIC Prohibited Trans-

3. The Court has included the print version of the U.S.Code sections at issue here. The Court found the print version more accurately set forth aspects of the statute such as its structure, spacing, and indentation, which is not found on unofficial online versions.

action Class. On the face of the statutory section, no causation is required. The statute simply states that a fiduciary shall not deal with the assets of a plan in the fiduciary's own interest. There is no language about *causing* a prohibited transaction as Defendants argued. (*See* Opp'n at 26.) There is causation language in § 1106(a)(1): "A fiduciary with respect to a plan shall not *cause* the plan to engage in a transaction...." 29 U.S.C. § 1106(a)(1) (emphasis added). The absence of this causation language in subsection (b) indicates that, at least facially, there is no need for Plaintiffs to establish causation—either there was a prohibited self-dealing transaction under (b) or there was not.

Additionally, the plain language and structure of the statute undercuts Defendants' argument that they are protected by exceptions in 29 U.S.C. § 1108. Again, under "(a) Transactions between plan and party in interest," Congress included language that is not repeated under "(b) Transactions between plan and fiduciary." *Id.* § 1106. Directly under the (a) heading, slightly indented, Congress wrote: "Except as provided in section 1108 of this title:" and then provided subsections (1) and (2), listing out prohibited transactions. That language ("Except as provided ...") is not repeated under subsection (b), and it is not provided above both subsections (a) and (b) as a disclaimer clearly applying to both kinds of prohibited transactions. Nor is subsection (b) a part of or dependent on subsection (a)—subsection (b) is an independent heading, equal to (a). In place of a lead-in with reference to exceptions, subsection (b) has a lead-in stating: "A fiduciary with respect to a plan shall not," then listing three prohibited transactions, (1) through (3).

Looking at the way Congress organized § 1106, it appears that the language indented under each subsection, (a) and (b), is meant to only apply to the particular subsection in which the language is located and not to other, independent subsections. The Court provides a complete primary source version of the statutes (and § 1108) at the end of this Order because the structure Congress intended is more clearly seen in print than

with purely electronic versions of the statute in terms of spacing and indents. While it is not determinative of what Congress intended, the structure and the plain language of the statute provide strong evidence that the exceptions contained in § 1108 are referenced only in § 1106(a) and that is the only subsection to which they apply absent some other indication.

Section 1108 does provide such indication to the contrary. Subsection (a), titled "Grant of exemptions" details how the Secretary can grant an exemption from the prohibited transactions of §§ 1106 and 1107(a). 29 U.S.C. § 1108(a). Somewhat in tension with the structural and plain language analysis of § 1106 given above, subsection (a) of § 1108 does have instructions for creating exceptions to § 1106(b), although such exceptions are singled out as more difficult to make than those for § 1106(a) and § 1107(a): "The Secretary may not grant an exemption under this subsection from section 1106(b) of this title unless he affords an opportunity for a hearing and makes a determination on the record with respect to the findings required by paragraphs (1), (2), and (3) of this subsection." *Id.* § 1108(a).

Further, subsection (b) is titled, "Enumeration of transactions exempted from section 1106 prohibitions." 29 U.S.C. § 1108(b). Indented below it, Congress stated: "The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:" followed by the enumeration of detailed exceptions in subsections (1) through (20). *Id.* Most exceptions explicitly involve parties in interest, governed by § 1106(a), but not all. *See id.* § 1108(b)(1)–(3), (5), (8), (12), (15)–(18), (20). Subsection (b)(19), not argued by the parties here, is the only subsection that explicitly mentions § 1106(b), and it provides for how cross trading "of a security between a plan and any other account managed by the same investment manager" can take place without violating § 1106(a)(1)(A) and (b)(2). *Id.* § 1108(b)(19). While it appears incongruent with the structure and language of § 1106(a) and (b) to allow exemptions to § 1106(b), this cross trading exemption applies to both § 1106(a) and (b) prohibited transactions based on

§ 1108(b)(19)'s plain language. No other exemption under § 1108(b) mentions § 1106(b), though many single out § 1106(a) and other statutory sections. Therefore, it appears that the later enacted sections in § 1108 indicate Congress's intention for at least some § 1108(b) exemptions to apply to prohibited transactions in § 1106(b).

Relevant here as potential exceptions argued by Defendants are subsections (b)(8) and (c)(2). First, subsection (b)(8) provides:

> (8) Any transaction between a plan and (i) a common or collective trust fund or pooled investment fund maintained by a party in interest which is a bank or trust company supervised by a State or Federal agency or (ii) a pooled investment fund of an insurance company qualified to do business in a State, if—
>> (A) the transaction is a sale or purchase of an interest in the fund,
>> (B) the bank, trust company, or insurance company receives not more than reasonable compensation, and
>> (C) such transaction is expressly permitted by the instrument under which the plan is maintained, or by a fiduciary (other than the bank, trust company, or insurance company, or an affiliate thereof) who has authority to manage and control the assets of the plan.

Defendants argue that they fall into this subsection and that it should be applied to otherwise prohibited transactions under § 1106(b). Defendants explain that this exemption "expressly allows regulated insurers to invest client assets in pooled separate accounts like TLIC's separate accounts here—even in circumstances involving alleged self-dealing—where the insurer receives no more than reasonable compensation, and either the plan document permits such investments or the investment is approved by fiduciary independent of the insurer." (Dkt. No. 385, Def. Supp. Brief, at 1.)

Perhaps this reading of the exemption is correct, but it seems that Defendants are missing Plaintiffs' allegation, which is not that TLIC invested client assets in pooled separate accounts, but rather that TLIC paid its fees—which TLIC had the discretion to change at thirty days notice—out of the plan assets that TLIC was holding. Thus, it is not clear to the Court how the (b)(8) exemption, assuming it applies to § 1106(b) based on the plain reading of § 1108 described above, clears Defendants from the prohibited transaction at issue in this case.

Subsection (b)(8) appears concerned with exempting transactions that are "a sale or purchase in the fund" for which "the bank, trust company, or insurance company receives not more than reasonable compensa-

tion," and if "such transaction is expressly permitted by the instrument under which the plain is maintained, or by a fiduciary (other than the bank, trust company, or insurance company or an affiliate thereof) who has authority to manage and control the assets of the plan." *Id.* § 1108(b)(8)(A)–(C). The transaction Plaintiffs challenge is not "a sale or purchase in the fund," but instead the act of TLIC taking its own fees out of the plan assets over which TLIC exercises fiduciary management. Therefore, the Court finds § 1108(b)(8) does not apply to the prohibited transaction Plaintiffs are alleging in this case, even if it can in theory apply to other prohibited transactions under § 1106(b).

Second, Defendants appear to argue that their conduct is exempted under § 1108(c)(2). Subsection (c) under § 1108 is titled, "Fiduciary benefits and compensation not prohibited by section 1006," and it states that "[n]othing in section 1106 of this title shall be construed to prohibit any fiduciary from" (1) receiving benefits as a participant or beneficiary of a plan, or (2) "receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan," or (3) "serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest." *Id.* § 1108(c)(1)–(3). This

subsection allows a fiduciary to receive "reasonable compensation" for services rendered, the main issue in Plaintiffs' excessive fee classes being what that reasonable compensation is. The prohibited transaction classes, by contrast, claim that regardless of the fee Defendants charge being reasonable, by taking the fee directly out of the plan assets, Defendants are engaged in prohibited self-dealing under § 1106(b)(1). Thus, the question here is whether § 1108(c)(2) allows for Defendants to pay their fees from the plan assets they hold as alleged fiduciaries.

█ In *Barboza*, the Ninth Circuit held that an ERISA-protected welfare benefit plan fiduciary engages in per se self-dealing when the fiduciary pays its own fees from plan assets. *Barboza*, 799 F.3d at 1269. The "safe harbor for fiduciary compensation" in § 1108(c)(2) does not apply to a "fiduciary who engages in a prohibited transaction under 29 U.S.C. § 1106(b)(1) by paying itself from the assets of a welfare benefit plan." *Id.* at 1269–70 (citing *Patelco*, 262 F.3d at 910–11). "In other words, while a plan may pay a fiduciary 'reasonable compensation for services rendered' under 29 U.S.C. § 1108, the fiduciary may not engage in self-dealing under 29 U.S.C. § 1106(b) by paying itself from plan funds. Such conduct constitutes a per se violation of § 1106(b)(1)." *Barboza*, 799 F.3d at 1269 (citing *Patelco*, 262 F.3d at 910–11) (internal citations omitted).

The defendants in *Barboza*—supported by the Department of Labor—argued that such payment was not a per se prohibited transaction in both the rehearing of the Ninth Circuit case and the petition for a writ of certiorari to the Supreme Court. However, the Ninth Circuit did not change its analysis in the amended decision and the Supreme Court, after considering the fully briefed petition, denied the petition. *Cal. Ass'n of Prof'l Firefighters v. Barboza*, — U.S. —, 136 S.Ct. 1171, 194 L.Ed.2d 178 (2016).

*Patelco* involved a similar situation to that in *Barboza*. The plaintiffs there sued under ERISA for breach of fiduciary duties by Defendant Sahni and his companies in administering the plaintiffs' employee health benefit plan. *Patelco*, 262 F.3d at 900. Sahni controlled the assets for the plan and took monthly administrative fees, which were allegedly disclosed to the plans, out of those assets. *Id.* at 909–10. Sahni argued that the fees were reasonable compensation under § 1108(c). *Id.* at 910. The plaintiffs claimed that Sahni was self-dealing in violation of 29 U.S.C. § 1106(b). The Ninth Circuit held that "the reasonable compensation provision does not apply to fiduciary self-dealing." *Patelco*, 262 F.3d at 911. It undertook a close statutory analysis, examining the different language under § 1106(a) compared to § 1106(b):

> 29 U.S.C. § 1106(a) prohibits fiduciaries from causing the plan to engage in specified transactions with parties in interest "[e]xcept as provided in section 1108 of this title." But 29 U.S.C. § 1106(b), which prohibits fiduciary self-dealing, makes no mention of the exceptions in § 1108.

*Patelco*, 262 F.3d at 910. Further, the Ninth Circuit examined Department of Labor regulations, which it concluded supported its reading of the statute that the reasonable compensation in § 1108(c) only modified § 1108(b) exceptions and "does not establish an independent exception." *Patelco*, 262 F.3d at 910–11 (citing 29 C.F.R. §§ 2550.408b–2(a), 2550.408c–2(a)). The court has determined that other cases that examined "the applicability of § 1108 to § 1106(b) are in accord that reasonable compensation does not apply to fiduciary self-dealing." *Patelco*, 262 F.3d at 911 (collecting cases).

In both *Barboza* and *Patelco*, the fiduciary defendant had a contract with the plan and permission to take administrative and service fees from the plan funds. *Barboza*, 799 F.3d at 1263, 1270 n. 5 ("Because fiduciary self-dealing under 29 U.S.C. § 1106(b)(1) is a per se violation of ERISA, it is irrelevant that [Defendant] CAISI was authorized to pay its own fees and expenses from Plan assets pursuant to its administrative services agreement with [Defendant] CAPF."); *Patelco*, 262 F.3d at 901, 909–10.

The Court holds that under its reading of *Barboza*, which is controlling Ninth Circuit

precedent,[4] a fiduciary cannot pay itself out of the plan assets over which the fiduciary exercises its fiduciary duties—period. This rule applies regardless of whether the fees are agreed upon service fees disclosed in a contract and constitute reasonable compensation for services provided. The policy behind this rule is that certain fundamental fiduciary duties, including the duty against self-dealing, are essentially sacrosanct. Thus, it does not matter if there is no bad faith, or if the fee is reasonable compensation for services provided. As stated by the court in *Gilliam v. Edwards*, 492 F.Supp. 1255 (D.N.J.1980), and quoted by the Ninth Circuit in *Patelco*:

> Section 1106(b) thus creates a per se ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans. In essence, a combined reading of §§ 1106 and 1108 and the relevant regulation suggests that a fiduciary, normally permitted to receive reasonable compensation for services rendered—this rule is preserved by the § 1108 exemption—may not if self-dealing is involved in the transaction securing the payment.

*Id.* at 1263 (citation and footnote omitted); *see also Cutaiar v. Marshall*, 590 F.2d 523, 530 (3d Cir.1979) ("That such extensive publication and hearing procedures were established by Congress [in § 1108] before [an] exemption may be authorized indicates an intent to create, in § 406(b), a blanket prohibition of certain transactions, no matter how fair, unless the statutory exemption procedures are followed."); *cf.* George Gleason Bogert et al., *The Law of Trusts and Trustees*, § 543. The rule is a decision that the party of in charge of another's funds cannot take its own fee out of those funds because there is too much *potential* for abuse, even in the absence of such conduct in a particular case.

■ As the class is alleged here, Plaintiffs claim that TLIC as a fiduciary has taken its service fees out of plan assets, and under *Barboza*, this is a per se prohibited transaction even if all other fiduciaries and beneficiaries were aware of the fees, how they were paid, and even agreed to such a system. Defendants argued that their practice of taking the service fees out of plan assets is efficient, industry standard, and approved by the Department of Labor. This Court is mindful of these considerations, but based on the statute and the Ninth Circuit cases, it appears that Congress has emphasized the need to avoid potential abuses over these other considerations. Further, Defendants contend that requiring some other method of obtaining fees would require restructuring their business model. This issue was not addressed in detail by either party. Therefore, the Court declines to speculate about whether there may be methods of payment available that are not unduly burdensome and comply with the law provided in the statute and the Ninth Circuit.

---

4. The only case Defendants rely on is *Dupree v. Prudential Insurance Co. of America*, No. 99–8337–CIV–Jordan, 2007 WL 2263892, at *42–43 (S.D.Fla. Aug. 7, 2007)(unpublished), for their argument that exemptions from § 1108 apply to prohibited transactions under § 1106. (*See* Dkt. No. 385, Def. Supp. Brief, 3–4.) The Court not only finds this case unpersuasive in its analysis of the application of § 1108(b)(2) and (b)(8) to prohibited transactions under § 1106(b), but also is bound to follow the law of the Ninth Circuit. The case relied heavily on Department of Labor opinion letters, which are not binding or entitled to *Chevron* deference like regulations are, as well as a short statutory analysis where § 1108 was examined before examining the language of § 1106. *Dupree*, 529 U.S. 1089, 120 S.Ct. 1725, 146 L.Ed.2d 646, at *42–43. Also, the court in *Dupree* did not opine on whether fees were a "transaction" under (b)(8) or on the application of (c)(2) to § 1106(b).

Defendants also rely on the Department of Labor opinion letters and the contrast between a regulation explicitly providing that § 1108(b)(2) does not apply to prohibited transactions under § 1106(b) and the lack of such regulation for § 1108(b)(8). As explained above, it does not appear § 1108(b)(8) applies here, but even if it does, the Court holds that the reasoning behind the Ninth Circuit's conclusion in *Barboza* and *Patel* applies with equal force to other potential exemptions in § 1108 such that absent explicit naming of § 1106(b)—like occurred for cross trading in (b)(19)—the Court will not extend the reach of § 1108(b) exemptions into § 1106(b) without clearer direction from the Ninth Circuit or Congress.

While the merits of the class are not at issue here, the law from the Ninth Circuit dictates that the kind of prohibited transaction that Plaintiffs are alleging here is a per se violation if it is indeed found. Individualized inquiries are not necessary, as all that will be examined is whether TLIC is a fiduciary and if the fiduciary is paying administrative fees from plan assets in violation of § 1106(b)(1). Therefore, predominance is met for this class.

### ii. TIM and TAM Class

The TIM and TAM class allege two separate categories of claims: first, that TLIC committed a prohibited transaction and second, that TLIC breached ·three duties by allowing its affiliates, TIM and TAM, to charge excessive fees. (Mot. at 6.)

### (A) TIM and TAM Prohibited Transactions

This class alleges violation of 29 U.S.C. § 1106(b)(1) and (2), which prohibits self-dealing as quoted above, as well as dealing with a third party with interests adverse to the plan: "A fiduciary with respect to a plan shall not—. . . (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries." Plaintiffs argue that "TLIC's purchase of units in affiliated funds, managed by TIM and TAM, who charged a management fee" are prohibited transactions under these subsections. (Mot. at 19.)

Plaintiffs acknowledge that the complaint alleges violations of (b)(1) and (b)(3), but state they are no longer pursuing their (b)(3) allegation. Instead, Plaintiffs request the Court to allow them to bring an allegation under (b)(2) and seek leave to amend their complaint for that limited purpose. (Id. at 21–22 & n.6.)

For the TIM and TAM claims under § 1106(b)(1), Plaintiffs explain that TLIC engaged in self-dealing "by repeatedly investing plan assets in affiliated funds and by paying a fee to its affiliates," because by so doing, "TLIC dealt with 'assets of the plan it [its] own interest.' " (Mot. at 21 (quoting 29 U.S.C. § 1106(b)(1)).) TIM and TAM were participants in TLIC's prohibited transactions and therefore Plaintiffs argue they must disgorge profits and make restitution. (Id. ) Further, Plaintiffs allege "[s]ince TIM and TAM have not waived their fees" for the TLIC plans despite TLIC's affiliation with TIM and TAM, TIM and TAM violated (b)(1). (Id. at 21–22.)

For the TIM and TAM claims under § 1106(b)(2), Plaintiffs allege that TLIC committed a prohibited transaction when it acted on behalf of or represented TIM and TAM, whose interests were adverse to the plans. (Id. at 22.) Specifically, Plaintiffs argue that TLIC violated (b)(2) by: "(a) favorably evaluating TIM and TAM Funds notwithstanding their excessive fees (see, e.g., Dec. RL, Ex. 28, pp. 2–5); (b) depositing money with TIM and TAM so that their fees would be paid from plan assets; (c) paying TIM and TAM; and (d) repeatedly buying shares in these Affiliated Advised Accounts." (Id. at 23.) Plaintiffs argue the questions for (b)(2) are also common to the class: whether TLIC is a fiduciary, the status of TIM and TAM as affiliates of TLIC, and whether TIM and TAM were paid fees from plan funds. (Id. at 24.)

The same logic applies here and a per se violation would not require individualized proof. However, some of Plaintiffs' allegations are different for the TIM and TAM Class than from the TLIC Prohibited Transaction Class. To the extent that Plaintiffs are alleging TLIC again took funds from the plans to pay itself and its affiliates, that would appear to fall under the same rule as the TLIC Prohibited Transaction class. But the different theories of self-dealing under (b)(1) and (b)(2) may not have a simple, per se answer, or may be subject to defenses. The Court holds that predominance is facially met at this point in the litigation. It appears from Plaintiffs' arguments that the same issues of fact and law predominate for all the different plans because the same actions of TLIC, TIM, and TAM are alleged to be violations of § 1106(b) for all the different plans.

The Court also grants Plaintiffs leave to amend the complaint to drop the (b)(3) claim and to add the (b)(2) claim. The parties are aware of the underlying facts giving rise to the claim and the theory is essentially the same. Defendant has not objected to the proposed amendment. Since there are no notice issues and no injustice by allowing the amendment, the Court grants Plaintiffs fourteen days from the date of this Order to amend the complaint consistent with this paragraph.

### (B) TIM and TAM Excessive Fees

Plaintiffs argue that the question at issue for this subpart of the class is whether TIM and TAM's fees were excessive. (Mot. at 26.) Plaintiffs allege that TLIC breached three duties under 29 U.S.C. § 1104(a)(1)(A), (A)(ii), and (B) (duties of loyalty, to defray only reasonable expenses, and prudence, respectively). (Mot. at 6.) According to Plaintiffs, "TLIC allowed TIM and TAM to charge investors in the Affiliated Separate Accounts higher fees than the fees TAM charged to others with whom it bargained at arm's length for the same services." (*Id.*) For damages, Plaintiffs claim that the TIM and TAM class would receive the part of the fees that were excessive, but that this calculation can be done "using a common method that is a mechanical process." (*Id.* at 26–27.) What makes the fees excessive, Plaintiffs explain, is the rates charged by TIM and TAM to outside clients, which are considerably lower than the fees charged to TLIC plans. (Reply at 25.)

Defendants state:

Plaintiffs also pursue a related theory that TLIC breached fiduciary duties by "allowing" TI Management and TA Management to collect IM/Admin charges from affiliated Ret Opts that exceeded what TI Management and TA Management charged institutional clients to manage like investment portfolios. This is simply their excessive fee claim by another label. The Court has already recognized that under TLIC's bundled service arrangement, investment-level fees (including those charged on affiliated Ret Opts) are used to provide more than just portfolio management services; they are also used to defray the costs of plan-

and participant-level services. (Dkt. No. 354 at 30–31.) For the reasons already developed, plaintiffs' excessive fee claims do not raise predominant common questions, and can only proceed individually. This is true however they are labeled.

(Opp'n at 24 n.18.)

█ The Court holds based on the state of the record at this point that there appear to be common issues of fact and law among the TIM and TAM investors alleged as class members based on Plaintiffs' representations. Therefore, the TIM and TAM class satisfies this requirement.

### b. Superiority

Rule 23(b)(3) also requires a class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The Rule further provides four factors the Court must consider in Rule 23(b)(3)(A) through (D):

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

█ Here, a class action is superior to individual suits, particularly because the costs of bringing an action likely exceed the potential individual damages award, as this Court mentioned in its previous Order. (Order, dkt. no. 354, at 35.) In the previous Order, the Court was concerned with individual issues predominating, and thus a class action would not have ultimately been superior with the class definition then provided. (*Id.*) Now, there are less difficulties in managing a class action because common issues of law and fact predominate. Further, no other lawsuits have been brought by class members to the Court's and parties' knowledge, and venue in this Court is appropriate.

(*See* Mot. at 28.) Therefore, the Court finds the class action superior to other forms of litigation.

## C. Ascertainability

■ Although not strictly a Rule 23 requirement, courts have held that a threshold requirement for class certification is that the class, as defined, "must be adequately defined and clearly ascertainable before a class action may proceed." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D.Cal.2011) (quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679–80 (S.D.Cal.1999)). The class definition should be "precise, objective and presently ascertainable" such that "it is administratively feasible to determine whether a particular person is a class member." *Id.* (quotation marks and citations omitted).

The *Manual for Complex Litigation* indicates that the concerns that motivate the ascertainability inquiry are less pressing in an action under Rule 23(b)(1) or (b)(2) as compared to a Rule 23(b)(3) action:

> Because individual class members must receive the best notice practicable and have an opportunity to opt out, and because individual damage claims are likely, Rule 23(b)(3) actions require a class definition that will permit identification of individual class members, while Rule 23(b)(1) or (b)(2) actions may not.

Federal Judicial Center, *Manual for Complex Litigation, Fourth*, § 21.222 (2004).

Plaintiffs have defined the prohibited transaction classes clearly, and explained ascertainability: The TLIC Prohibited Transaction Class is "all plans serviced by TLIC under its GAC Form that made investments in any of TLIC's Ret Opt investment options." (Mot. at 8.) This class is identifiable by TLIC's records that would indicate which plans had investment is Ret Opt investment options. Plaintiffs indicate that defense expert Dr. Strombom has already quantified the plans holding Ret Opt investments. (*Id.* (citing Dec. RL, Ex. 6 at Ex. 1).)

The TIM and TAM Prohibited Transaction Class is "all plans that made investments in TLIC's Ret Opt investment options which were either directly advised by TIM or were invested in mutual funds advised by TAM." (*Id.* at 14.) Plaintiffs argue that Dr. Strombom has already "used Defendants' records to identify the plans invested in TIM-managed and TAM-managed options." (*Id.* (citing Dec. RL, Ex. 12.)

Defendants have not argued that these classes are not ascertainable. Instead, Defendants focused almost exclusively on the issue of causation as to the prohibited transaction classes. (Opp'n at 24–28.)

The Court finds that Plaintiffs' proposed prohibited transaction classes for TLIC and TIM and TAM are ascertainable under the methods described, particularly as Defendants have not provided any argument to the contrary. Further, the TIM and TAM excessive fee class is also ascertainable as shown by the defense expert's use of records to identify qualifying class members. Therefore, the TLIC Prohibited Transaction Class and the TIM and TAM Class are both ascertainable.

## IV. CONCLUSION

For all the reasons listed above, the Court GRANTS Plaintiff's Second Motion for Class Certification. Plaintiffs are granted fourteen days leave to amend the Complaint, as detailed above.

IT IS SO ORDERED.

Attachment

# UNITED STATES CODE

## 2012 EDITION

### CONTAINING THE GENERAL AND PERMANENT LAWS OF THE UNITED STATES ENACTED THROUGH THE 112TH CONGRESS

(ending January 2, 2013, the last law of which was signed on January 15, 2013)

Prepared and published under authority of Title 2, U.S. Code, Section 285b, by the Office of the Law Revision Counsel of the House of Representatives

## VOLUME TWENTY–TWO

### TITLE 29—LABOR

TO

### TITLE 30—MINERAL LANDS AND MINING

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 2013

76-421 v22_T D Sig-1

# 316

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## (b) Assets held by two or more trustees

(1) Except as otherwise provided in subsection (d) of this section and in section 1103(a)(1) and (2) of this title, if the assets of a plan are held by two or more trustees—

(A) each shall use reasonable care to prevent a co-trustee from committing a breach; and

(B) they shall jointly manage and control the assets of the plan, except that nothing in this subparagraph (B) shall preclude any agreement, authorized by the trust instrument, allocating specific responsibilities, obligations, or duties among trustees, in which event a trustee to whom certain responsibilities, obligations, or duties have not been allocated shall not be liable by reason of this subparagraph (B) either individually or as a trustee for any loss resulting to the plan arising from the acts or omissions on the part of another trustee to whom such responsibilities, obligations, or duties have been allocated.

(2) Nothing in this subsection shall limit any liability that a fiduciary may have under subsection (a) of this section or any other provision of this part.

(3)(A) In the case of a plan the assets of which are held in more than one trust, a trustee shall not be liable under paragraph (1) except with respect to an act or omission of a trustee of a trust of which he is a trustee.

(B) No trustee shall be liable under this subsection for following instructions referred to in section 1103(a)(1) of this title.

## (c) Allocation of fiduciary responsibility; designated persons to carry out fiduciary responsibilities

(1) The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.

(2) If a plan expressly provides for a procedure described in paragraph (1), and pursuant to such procedure any fiduciary responsibility of a named fiduciary is allocated to any person, or a person is designated to carry out any such responsibility, then such named fiduciary shall not be liable for an act or omission of such person in carrying out such responsibility except to the extent that—

(A) the named fiduciary violated section 1104(a)(1) of this title—

(i) with respect to such allocation or designation,

(ii) with respect to the establishment or implementation of the procedure under paragraph (1), or

(iii) in continuing the allocation or designation; or

(B) the named fiduciary would otherwise be liable in accordance with subsection (a) of this section.

(3) For purposes of this subsection, the term "trustee responsibility" means any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan, other than a power under the trust instrument of a named fiduciary to appoint an investment manager in accordance with section 1102(c)(3) of this title.

## (d) Investment managers

(1) If an investment manager or managers have been appointed under section 1102(c)(3) of this title, then, notwithstanding subsections (a)(2) and (3) and subsection (b) of this section, no trustee shall be liable for the acts or omissions of such investment manager or managers, or be under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager.

(2) Nothing in this subsection shall relieve any trustee of any liability under this part for any act of such trustee.

(Pub. L. 93–406, title I, § 405, Sept. 2, 1974, 88 Stat. 878.)

## § 1106. Prohibited transactions

### (a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

### (b) Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**(c) Transfer of real or personal property to plan by party in interest**

A transfer of real or personal property by a party in interest to a plan shall be treated as a sale or exchange if the property is subject to a mortgage or similar lien which the plan assumes or if it is subject to a mortgage or similar lien which a party-in-interest placed on the property within the 10-year period ending on the date of the transfer.

(Pub. L. 93–406, title I, § 406, Sept. 2, 1974, 88 Stat. 879.)

**§ 1107. Limitation with respect to acquisition and holding of employer securities and employer real property by certain plans**

**(a) Percentage limitation**

Except as otherwise provided in this section and section 1114 of this title:

(1) A plan may not acquire or hold—

(A) any employer security which is not a qualifying employer security, or

(B) any employer real property which is not qualifying employer real property.

(2) A plan may not acquire any qualifying employer security or qualifying employer real property, if immediately after such acquisition the aggregate fair market value of employer securities and employer real property held by the plan exceeds 10 percent of the fair market value of the assets of the plan.

(3)(A) After December 31, 1984, a plan may not hold any qualifying employer securities or qualifying employer real property (or both) to the extent that the aggregate fair market value of such securities and property determined on December 31, 1984, exceeds 10 percent of the greater of—

(i) the fair market value of the assets of the plan, determined on December 31, 1984, or

(ii) the fair market value of the assets of the plan determined on January 1, 1975.

(B) Subparagraph (A) of this paragraph shall not apply to any plan which on any date after December 31, 1974; and before January 1, 1985, did not hold employer securities or employer real property (or both) the aggregate fair market value of which determined on such date exceeded 10 percent of the greater of

(i) the fair market value of the assets of the plan, determined on such date, or

(ii) the fair market value of the assets of the plan determined on January 1, 1975.

(4)(A) After December 31, 1979, a plan may not hold any employer securities or employer real property in excess of the amount specified in regulations under subparagraph (B). This subparagraph shall not apply to a plan after the earliest date after December 31, 1974, on which it complies with such regulations.

(B) Not later than December 31, 1976, the Secretary shall prescribe regulations which shall have the effect of requiring that a plan divest itself of 50 percent of the holdings of employer securities and employer real property which the plan would be required to divest before January 1, 1985, under paragraph (2) or subsection (c) of this section (whichever is applicable).

**(b) Exception**

(1) Subsection (a) of this section shall not apply to any acquisition or holding of qualifying employer securities or qualifying employer real property by an eligible individual account plan.

(2)(A) If this paragraph applies to an eligible individual account plan, the portion of such plan which consists of applicable elective deferrals (and earnings allocable thereto) shall be treated as a separate plan—

(i) which is not an eligible individual account plan, and

(ii) to which the requirements of this section apply.

(B)(i) This paragraph shall apply to any eligible individual account plan if any portion of the plan's applicable elective deferrals (or earnings allocable thereto) are required to be invested in qualifying employer securities or qualifying employer real property or both—

(I) pursuant to the terms of the plan, or

(II) at the direction of a person other than the participant on whose behalf such elective deferrals are made to the plan (or a beneficiary).

(ii) This paragraph shall not apply to an individual account plan for a plan year if, on the last day of the preceding plan year, the fair market value of the assets of all individual account plans maintained by the employer equals not more than 10 percent of the fair market value of the assets of all pension plans (other than multiemployer plans) maintained by the employer.

(iii) This paragraph shall not apply to an individual account plan that is an employee stock ownership plan as defined in section 4975(e)(7) of title 26.

(iv) This paragraph shall not apply to an individual account plan if, pursuant to the terms of the plan, the portion of any employee's applicable elective deferrals which is required to be invested in qualifying employer securities and qualifying employer real property for any year may not exceed 1 percent of the employee's compensation which is taken into account under the plan in determining the maximum amount of the employee's applicable elective deferrals for such year.

(C) For purposes of this paragraph, the term "applicable elective deferral" means any elective deferral (as defined in section 402(g)(3)(A) of title 26) which is made pursuant to a qualified cash or deferred arrangement as defined in section 401(k) of title 26.

satisfies the requirements of subsection (f)(1) of this section."

1989—Subsec. (d)(3)(A), (6)(A), (7). Pub. L. 101–239, §7891(a)(1), substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

Subsec. (d)(3)(C). Pub. L. 101–239, §7881(l)(1), realigned margin.

Subsec. (d)(6)(A). Pub. L. 101–239, §7894(e)(2), substituted "money purchase plan" for "money purchase" and "employer securities" for "employee securities".

Subsec. (d)(9). Pub. L. 101–239, §7881(l)(2), substituted "such individual account plan" for "such arrangement" and realigned margin.

Subsec. (f)(1). Pub. L. 101–239, §7881(l)(3)(A), (4), substituted "paragraph" for "subsection" and "if, immediately following the acquisition of such stock" for "if".

Subsec. (f)(3). Pub. L. 101–239, §7881(l)(3)(B), struck out par. (3) which read as follows: "After December 17, 1987, no plan may acquire stock which does not satisfy the requirements of paragraph (1) unless the acquisition is made pursuant to a legally binding contract in effect on such date."

1987—Subsec. (d)(3)(C). Pub. L. 100–203, §9345(a)(1), added subpar. (C).

Subsec. (d)(5). Pub. L. 100–203, §9345(b)(1), inserted at end "After December 17, 1987, in the case of a plan other than an eligible individual account plan, stock shall be considered a qualifying employer security only if such stock satisfies the requirements of subsection (f)(1) of this section."

Subsec. (d)(9). Pub. L. 100–203, §9345(a)(2), added par. (9).

Subsec. (f). Pub. L. 100–203, §9345(b)(2), added subsec. (f).

#### EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by Pub. L. 109–280 applicable to plan years beginning after Dec. 31, 2006, with special rules for collectively bargained agreements and certain employer securities held in an ESOP, see section 901(c) of Pub. L. 109–280, set out as a note under section 401 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1997 AMENDMENT

Pub. L. 105–34, title XV, §1524(b), Aug. 5, 1997, 111 Stat. 1072, as amended by Pub. L. 107–16, title VI, §655(a), June 7, 2001, 115 Stat. 131, provided that:

"(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this section [amending this section] shall apply to elective deferrals for plan years beginning after December 31, 1998.

"(2) NONAPPLICATION TO PREVIOUSLY ACQUIRED PROPERTY.—The amendments made by this section shall not apply to any elective deferral which is invested in assets consisting of qualifying employer securities, qualifying employer real property, or both, if such assets were acquired before January 1, 1999."

[Pub. L. 107–16, title VI, §655(b), June 7, 2001, 115 Stat. 131, provided that: "The amendment made by this section [amending section 1524(b) of Pub. L. 105–34, set out above] shall apply as if included in the provision of the Taxpayer Relief Act of 1997 [Pub. L. 105–34] to which it relates."]

#### EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101–540, §2, Nov. 8, 1990, 104 Stat. 2379, provided that: "The amendment made by section 1 [amending this section] shall apply to interests in publicly traded partnerships acquired before, on, or after January 1, 1987."

#### EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by section 7881(l)(1)–(4) of Pub. L. 101–239 effective, except as otherwise provided, as if included in the provision of the Pension Protection Act, Pub. L. 100–203, §§9302–9346, to which such amendment relates,

see section 7882 of Pub. L. 101–239, set out as a note under section 401 of Title 26, Internal Revenue Code.

Amendment by section 7891(a)(1) of Pub. L. 101–239 effective, except as otherwise provided, as if included in the provision of the Tax Reform Act of 1986, Pub. L. 99–514, to which such amendment relates, see section 7891(f) of Pub. L. 101–239, set out as a note under section 1002 of this title.

Amendment by section 7894(e)(2) of Pub. L. 101–239 effective, except as otherwise provided, as if originally included in the provision of the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, to which such amendment relates, see section 7894(i) of Pub. L. 101–239, set out as a note under section 1002 of this title.

#### EFFECTIVE DATE OF 1987 AMENDMENT

Pub. L. 100–203, title IX, §9345(a)(3), Dec. 22, 1987, 101 Stat. 1330–373, provided that: "The amendments made by this subsection [amending this section] shall apply with respect to arrangements established after December 17, 1987."

#### REGULATIONS

Secretary authorized, effective Sept. 2, 1974, to promulgate regulations wherever provisions of this part call for the promulgation of regulations, see sections 1031 and 1114 of this title.

### §1108. Exemptions from prohibited transactions

#### (a) Grant of exemptions

The Secretary shall establish an exemption procedure for purposes of this subsection. Pursuant to such procedure, he may grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by sections 1106 and 1107(a) of this title. Action under this subsection may be taken only after consultation and coordination with the Secretary of the Treasury. An exemption granted under this section shall not relieve a fiduciary from any other applicable provision of this chapter. The Secretary may not grant an exemption under this subsection unless he finds that such exemption is—

(1) administratively feasible,

(2) in the interests of the plan and of its participants and beneficiaries, and

(3) protective of the rights of participants and beneficiaries of such plan.

Before granting an exemption under this subsection from section 1106(a) or 1107(a) of this title, the Secretary shall publish notice in the Federal Register of the pendency of the exemption, shall require that adequate notice be given to interested persons, and shall afford interested persons opportunity to present views. The Secretary may not grant an exemption under this subsection from section 1106(b) of this title unless he affords an opportunity for a hearing and makes a determination on the record with respect to the findings required by paragraphs (1), (2), and (3) of this subsection.

#### (b) Enumeration of transactions exempted from section 1106 prohibitions

The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:

(1) Any loans made by the plan to parties in interest who are participants or beneficiaries of the plan if such loans (A) are available to all such participants and beneficiaries on a

reasonably equivalent basis, (B) are not made available to highly compensated employees (within the meaning of section 414(q) of title 26) in an amount greater than the amount made available to other employees, (C) are made in accordance with specific provisions regarding such loans set forth in the plan, (D) bear a reasonable rate of interest, and (E) are adequately secured. A loan made by a plan shall not fail to meet the requirements of the preceding sentence by reason of a loan repayment suspension described under section 414(u)(4) of title 26.

(2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

(3) A loan to an employee stock ownership plan (as defined in section 1107(d)(6) of this title), if—

(A) such loan is primarily for the benefit of participants and beneficiaries of the plan, and

(B) such loan is at an interest rate which is not in excess of a reasonable rate.

If the plan gives collateral to a party in interest for such loan, such collateral may consist only of qualifying employer securities (as defined in section 1107(d)(5) of this title).

(4) The investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution supervised by the United States or a State, if such bank or other institution is a fiduciary of such plan and if—

(A) the plan covers only employees of such bank or other institution and employees of affiliates of such bank or other institution, or

(B) such investment is expressly authorized by a provision of the plan or by a fiduciary (other than such bank or institution or affiliate thereof) who is expressly empowered by the plan to so instruct the trustee with respect to such investment.

(5) Any contract for life insurance, health insurance, or annuities with one or more insurers which are qualified to do business in a State, if the plan pays no more than adequate consideration, and if each such insurer or insurers is—

(A) the employer maintaining the plan, or

(B) a party in interest which is wholly owned (directly or indirectly) by the employer maintaining the plan, or by any person which is a party in interest with respect to the plan, but only if the total premiums and annuity considerations written by such insurers for life insurance, health insurance, or annuities for all plans (and their employers) with respect to which such insurers are parties in interest (not including premiums or annuity considerations written by the employer maintaining the plan) do not exceed 5 percent of the total premiums and annuity considerations written for all lines of insurance in that year by such insurers (not including premiums or annuity consider-

ations written by the employer maintaining the plan).

(6) The providing of any ancillary service by a bank or similar financial institution supervised by the United States or a State, if such bank or other institution is a fiduciary of such plan, and if—

(A) such bank or similar financial institution has adopted adequate internal safeguards which assure that the providing of such ancillary service is consistent with sound banking and financial practice, as determined by Federal or State supervisory authority, and

(B) the extent to which such ancillary service is provided is subject to specific guidelines issued by such bank or similar financial institution (as determined by the Secretary after consultation with Federal and State supervisory authority), and adherence to such guidelines would reasonably preclude such bank or similar financial institution from providing such ancillary service (i) in an excessive or unreasonable manner, and (ii) in a manner that would be inconsistent with the best interests of participants and beneficiaries of employee benefit plans.

Such ancillary services shall not be provided at more than reasonable compensation.

(7) The exercise of a privilege to convert securities, to the extent provided in regulations of the Secretary, but only if the plan receives no less than adequate consideration pursuant to such conversion.

(8) Any transaction between a plan and (i) a common or collective trust fund or pooled investment fund maintained by a party in interest which is a bank or trust company supervised by a State or Federal agency or (ii) a pooled investment fund of an insurance company qualified to do business in a State, if—

(A) the transaction is a sale or purchase of an interest in the fund,

(B) the bank, trust company, or insurance company receives not more than reasonable compensation, and

(C) such transaction is expressly permitted by the instrument under which the plan is maintained, or by a fiduciary (other than the bank, trust company, or insurance company, or an affiliate thereof) who has authority to manage and control the assets of the plan.

(9) The making by a fiduciary of a distribution of the assets of the plan in accordance with the terms of the plan if such assets are distributed in the same manner as provided under section 1344 of this title (relating to allocation of assets).

(10) Any transaction required or permitted under part 1 of subtitle E of subchapter III of this chapter.

(11) A merger of multiemployer plans, or the transfer of assets or liabilities between multiemployer plans, determined by the Pension Benefit Guaranty Corporation to meet the requirements of section 1411 of this title.

(12) The sale by a plan to a party in interest on or after December 18, 1987, of any stock, if—

(A) the requirements of paragraphs (1) and (2) of subsection (e) of this section are met with respect to such stock,

(B) on the later of the date on which the stock was acquired by the plan, or January 1, 1975, such stock constituted a qualifying employer security (as defined in section 1107(d)(5) of this title as then in effect), and

(C) such stock does not constitute a qualifying employer security (as defined in section 1107(d)(5) of this title as in effect at the time of the sale).

(13) Any transfer made before January 1, 2022, of excess pension assets from a defined benefit plan to a retiree health account in a qualified transfer permitted under section 420 of title 26 (as in effect on July 6, 2012).

(14) Any transaction in connection with the provision of investment advice described in section 1002(21)(A)(ii) of this title to a participant or beneficiary of an individual account plan that permits such participant or beneficiary to direct the investment of assets in their individual account, if—

(A) the transaction is—

(i) the provision of the investment advice to the participant or beneficiary of the plan with respect to a security or other property available as an investment under the plan,

(ii) the acquisition, holding, or sale of a security or other property available as an investment under the plan pursuant to the investment advice, or

(iii) the direct or indirect receipt of fees or other compensation by the fiduciary adviser or an affiliate thereof (or any employee, agent, or registered representative of the fiduciary adviser or affiliate) in connection with the provision of the advice or in connection with an acquisition, holding, or sale of a security or other property available as an investment under the plan pursuant to the investment advice; and

(B) the requirements of subsection (g) are met.

(15)(A) Any transaction involving the purchase or sale of securities, or other property (as determined by the Secretary), between a plan and a party in interest (other than a fiduciary described in section 1002(21)(A) of this title) with respect to a plan if—

(i) the transaction involves a block trade,

(ii) at the time of the transaction, the interest of the plan (together with the interests of any other plans maintained by the same plan sponsor), does not exceed 10 percent of the aggregate size of the block trade,

(iii) the terms of the transaction, including the price, are at least as favorable to the plan as an arm's length[1] transaction, and

(iv) the compensation associated with the purchase and sale is not greater than the compensation associated with an arm's length[1] transaction with an unrelated party.

(B) For purposes of this paragraph, the term "block trade" means any trade of at least

---

[1] So in original. Probably should be "arm's-length".

10,000 shares or with a market value of at least $200,000 which will be allocated across two or more unrelated client accounts of a fiduciary.

(16) Any transaction involving the purchase or sale of securities, or other property (as determined by the Secretary), between a plan and a party in interest if—

(A) the transaction is executed through an electronic communication network, alternative trading system, or similar execution system or trading venue subject to regulation and oversight by—

(i) the applicable Federal regulating entity, or

(ii) such foreign regulatory entity as the Secretary may determine by regulation,

(B) either—

(i) the transaction is effected pursuant to rules designed to match purchases and sales at the best price available through the execution system in accordance with applicable rules of the Securities and Exchange Commission or other relevant governmental authority, or

(ii) neither the execution system nor the parties to the transaction take into account the identity of the parties in the execution of trades,

(C) the price and compensation associated with the purchase and sale are not greater than the price and compensation associated with an arm's length[1] transaction with an unrelated party,

(D) if the party in interest has an ownership interest in the system or venue described in subparagraph (A), the system or venue has been authorized by the plan sponsor or other independent fiduciary for transactions described in this paragraph, and

(E) not less than 30 days prior to the initial transaction described in this paragraph executed through any system or venue described in subparagraph (A), a plan fiduciary is provided written or electronic notice of the execution of such transaction through such system or venue.

(17)(A) Transactions described in subparagraphs (A), (B), and (D) of section 1106(a)(1) of this title between a plan and a person that is a party in interest (other than a fiduciary (or an affiliate) who has or exercises any discretionary authority or control with respect to the investment of the plan assets involved in the transaction or renders investment advice (within the meaning of section 1002(21)(A)(ii) of this title) with respect to those assets, solely by reason of providing services to the plan or solely by reason of a relationship to such a service provider described in subparagraph (F), (G), (H), or (I) of section 1002(14) of this title, or both, but only if in connection with such transaction the plan receives no less, nor pays no more, than adequate consideration.

(B) For purposes of this paragraph, the term "adequate consideration" means—

(i) in the case of a security for which there is a generally recognized market—

(I) the price of the security prevailing on a national securities exchange which is registered under section 6 of the Securities

Exchange Act of 1934 [15 U.S.C. 78f], taking into account factors such as the size of the transaction and marketability of the security, or

(II) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of the party in interest, taking into account factors such as the size of the transaction and marketability of the security, and

(ii) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by a fiduciary or fiduciaries in accordance with regulations prescribed by the Secretary,

(18) FOREIGN EXCHANGE TRANSACTIONS.—Any foreign exchange transactions, between a bank or broker-dealer (or any affiliate of either), and a plan (as defined in section 1002(3) of this title) with respect to which such bank or broker-dealer (or affiliate) is a trustee, custodian, fiduciary, or other party in interest, if—

(A) the transaction is in connection with the purchase, holding, or sale of securities or other investment assets (other than a foreign exchange transaction unrelated to any other investment in securities or other investment assets),

(B) at the time the foreign exchange transaction is entered into, the terms of the transaction are not less favorable to the plan than the terms generally available in comparable arm's length[2] foreign exchange transactions between unrelated parties, or the terms afforded by the bank or broker-dealer (or any affiliate of either) in comparable arm's-length foreign exchange transactions involving unrelated parties,

(C) the exchange rate used by such bank or broker-dealer (or affiliate) for a particular foreign exchange transaction does not deviate by more than 3 percent from the interbank bid and asked rates for transactions of comparable size and maturity at the time of the transaction as displayed on an independent service that reports rates of exchange in the foreign currency market for such currency, and

(D) the bank or broker-dealer (or any affiliate of either) does not have investment discretion, or provide investment advice, with respect to the transaction.

(19) CROSS TRADING.—Any transaction described in sections 1106(a)(1)(A) and 1106(b)(2) of this title involving the purchase and sale of a security between a plan and any other account managed by the same investment manager, if—

(A) the transaction is a purchase or sale, for no consideration other than cash payment against prompt delivery of a security for which market quotations are readily available,

(B) the transaction is effected at the independent current market price of the security

(within the meaning of section 270.17a-7(b) of title 17, Code of Federal Regulations),

(C) no brokerage commission, fee (except for customary transfer fees, the fact of which is disclosed pursuant to subparagraph (D)), or other remuneration is paid in connection with the transaction,

(D) a fiduciary (other than the investment manager engaging in the cross-trades or any affiliate) for each plan participating in the transaction authorizes in advance of any cross-trades (in a document that is separate from any other written agreement of the parties) the investment manager to engage in cross trades at the investment manager's discretion, after such fiduciary has received disclosure regarding the conditions under which cross trades may take place (but only if such disclosure is separate from any other agreement or disclosure involving the asset management relationship), including the written policies and procedures of the investment manager described in subparagraph (H),

(E) each plan participating in the transaction has assets of at least $100,000,000, except that if the assets of a plan are invested in a master trust containing the assets of plans maintained by employers in the same controlled group (as defined in section 1107(d)(7) of this title), the master trust has assets of at least $100,000,000,

(F) the investment manager provides to the plan fiduciary who authorized cross trading under subparagraph (D) a quarterly report detailing all ·cross trades executed by the investment manager in which the plan participated during such quarter, including the following information, as applicable: (i) the identity of each security bought or sold; (ii) the number of shares or units traded; (iii) the parties involved in the cross-trade; and (iv) trade price and the method used to establish the trade price,

(G) the investment manager does not base its fee schedule on the plan's consent to cross trading, and no other service (other than the investment opportunities and cost savings available through a cross trade) is conditioned on the plan's consent to cross trading,

(H) the investment manager has adopted, and cross-trades are effected in accordance with, written cross-trading policies and procedures that are fair and equitable to all accounts participating in the cross-trading program, and that include a description of the manager's pricing policies and procedures, and the manager's policies and procedures for allocating cross trades in an objective manner among accounts participating in the cross-trading program, and

(I) the investment manager has designated an individual responsible for periodically reviewing such purchases and sales to ensure compliance with the written policies and procedures described in subparagraph (H), and following such review, the individual shall issue an annual written report no later than 90 days following the period to which it relates signed under penalty of perjury to

---

[2] So in original. Probably should be "arm's-length"

# 322

the plan fiduciary who authorized cross trading under subparagraph (D) describing the steps performed during the course of the review, the level of compliance, and any specific instances of non-compliance.

The written report under subparagraph (I) shall also notify the plan fiduciary of the plan's right to terminate participation in the investment manager's cross-trading program at any time.

(20)(A) Except as provided in subparagraphs (B) and (C), a transaction described in section 1106(a) of this title in connection with the acquisition, holding, or disposition of any security or commodity, if the transaction is corrected before the end of the correction period.

(B) Subparagraph (A) does not apply to any transaction between a plan and a plan sponsor or its affiliates that involves the acquisition or sale of an employer security (as defined in section 1107(d)(1) of this title) or the acquisition, sale, or lease of employer real property (as defined in section 1107(d)(2) of this title).

(C) In the case of any fiduciary or other party in interest (or any other person knowingly participating in such transaction), subparagraph (A) does not apply to any transaction if, at the time the transaction occurs, such fiduciary or party in interest (or other person) knew (or reasonably should have known) that the transaction would (without regard to this paragraph) constitute a violation of section 1106(a) of this title.

(D) For purposes of this paragraph, the term "correction period" means, in connection with a fiduciary or party in interest (or other person knowingly participating in the transaction), the 14-day period beginning on the date on which such fiduciary or party in interest (or other person) discovers, or reasonably should have discovered, that the transaction would (without regard to this paragraph) constitute a violation of section 1106(a) of this title.

(E) For purposes of this paragraph—
(i) The term "security" has the meaning given such term by section 475(c)(2) of title 26 (without regard to subparagraph (F)(iii) and the last sentence thereof).
(ii) The term "commodity" has the meaning given such term by section 475(e)(2) of title 26 (without regard to subparagraph (D)(iii) thereof).
(iii) The term "correct" means, with respect to a transaction—
(I) to undo the transaction to the extent possible and in any case to make good to the plan or affected account any losses resulting from the transaction, and
(II) to restore to the plan or affected account any profits made through the use of assets of the plan.

### (c) Fiduciary benefits and compensation not prohibited by section 1106

Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—
(1) receiving any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries;
(2) receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred; or
(3) serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest.

### (d) Owner-employees; family members; shareholder employees

(1) Section 1107(b) of this title and subsections (b), (c), and (e) of this section shall not apply to a transaction in which a plan directly or indirectly—
(A) lends any part of the corpus or income of the plan to,
(B) pays any compensation for personal services rendered to the plan to, or
(C) acquires for the plan any property from, or sells any property to,

any person who is with respect to the plan an owner-employee (as defined in section 401(c)(3) of title 26), a member of the family (as defined in section 267(c)(4) of such title) of any such owner-employee, or any corporation in which any such owner-employee owns, directly or indirectly, 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of the corporation.

(2)(A) For purposes of paragraph (1), the following shall be treated as owner-employees:
(i) A shareholder-employee.
(ii) A participant or beneficiary of an individual retirement plan (as defined in section 7701(a)(37) of title 26).
(iii) An employer or association of employees which establishes such an individual retirement plan under section 408(c) of such title.

(B) Paragraph (1)(C) shall not apply to a transaction which consists of a sale of employer securities to an employee stock ownership plan (as defined in section 1107(d)(6) of this title) by a shareholder-employee, a member of the family (as defined in section 267(c)(4) of such title) of any such owner-employee, or a corporation in which such a shareholder-employee owns stock representing a 50 percent or greater interest described in paragraph (1).

(C) For purposes of paragraph (1)(A), the term "owner-employee" shall only include a person described in clause (ii) or (iii) of subparagraph (A).

(3) For purposes of paragraph (2), the term "shareholder-employee" means an employee or officer of an S corporation (as defined in section 1361(a)(1) of such title) who owns (or is considered as owning within the meaning of section

318(a)(1) of such title) more than 5 percent of the outstanding stock of the corporation on any day during the taxable year of such corporation.

### (e) Acquisition or sale by plan of qualifying employer securities; acquisition, sale, or lease by plan of qualifying employer real property

Sections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 1107(d)(5) of this title) or acquisition, sale or lease by a plan of qualifying employer real property (as defined in section 1107(d)(4) of this title)—

(1) if such acquisition, sale, or lease is for adequate consideration (or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under section 1107(e)(1) of this title),

(2) if no commission is charged with respect thereto, and

(3) if—

(A) the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title), or

(B) in the case of an acquisition or lease of qualifying employer real property by a plan which is not an eligible individual account plan, or an acquisition of qualifying employer securities by such a plan, the lease or acquisition is not prohibited by section 1107(a) of this title.

### (f) Applicability of statutory prohibitions to mergers or transfers

Section 1106(b)(2) of this title shall not apply to any merger or transfer described in subsection (b)(11) of this section.

### (g) Provision of investment advice to participant and beneficiaries

#### (1) In general

The prohibitions provided in section 1106 of this title shall not apply to transactions described in subsection (b)(14) if the investment advice provided by a fiduciary adviser is provided under an eligible investment advice arrangement.

#### (2) Eligible investment advice arrangement

For purposes of this subsection, the term "eligible investment advice arrangement" means an arrangement—

(A) which either—

(i) provides that any fees (including any commission or other compensation) received by the fiduciary adviser for investment advice or with respect to the sale, holding, or acquisition of any security or other property for purposes of investment of plan assets do not vary depending on the basis of any investment option selected, or

(ii) uses a computer model under an investment advice program meeting the requirements of paragraph (3) in connection with the provision of investment advice by a fiduciary adviser to a participant or beneficiary, and

(B) with respect to which the requirements of paragraph (4), (5), (6), (7), (8), and (9) are met.

### (3) Investment advice program using computer model

#### (A) In general

An investment advice program meets the requirements of this paragraph if the requirements of subparagraphs (B), (C), and (D) are met.

#### (B) Computer model

The requirements of this subparagraph are met if the investment advice provided under the investment advice program is provided pursuant to a computer model that—

(i) applies generally accepted investment theories that take into account the historic returns of different asset classes over defined periods of time,

(ii) utilizes relevant information about the participant, which may include age, life expectancy, retirement age, risk tolerance, other assets or sources of income, and preferences as to certain types of investments,

(iii) utilizes prescribed objective criteria to provide asset allocation portfolios comprised of investment options available under the plan,

(iv) operates in a manner that is not biased in favor of investments offered by the fiduciary adviser or a person with a material affiliation or contractual relationship with the fiduciary adviser, and

(v) takes into account all investment options under the plan in specifying how a participant's account balance should be invested and is not inappropriately weighted with respect to any investment option.

#### (C) Certification

##### (i) In general

The requirements of this subparagraph are met with respect to any investment advice program if an eligible investment expert certifies, prior to the utilization of the computer model and in accordance with rules prescribed by the Secretary, that the computer model meets the requirements of subparagraph (B).

##### (ii) Renewal of certifications

If, as determined under regulations prescribed by the Secretary, there are material modifications to a computer model, the requirements of this subparagraph are met only if a certification described in clause (i) is obtained with respect to the computer model as so modified.

##### (iii) Eligible investment expert

The term "eligible investment expert" means any person—

(I) which meets such requirements as the Secretary may provide, and

(II) does not bear any material affiliation or contractual relationship with any investment adviser or a related person thereof (or any employee, agent, or registered representative of the investment adviser or related person).

#### (D) Exclusivity of recommendation

The requirements of this subparagraph are met with respect to any investment advice program if—

(i) the only investment advice provided under the program is the advice generated by the computer model described in subparagraph (B), and

(ii) any transaction described in subsection (b)(14)(A)(ii) occurs solely at the direction of the participant or beneficiary.

Nothing in the preceding sentence shall preclude the participant or beneficiary from requesting investment advice other than that described in subparagraph (A), but only if such request has not been solicited by any person connected with carrying out the arrangement.

**(4) Express authorization by separate fiduciary**

The requirements of this paragraph are met with respect to an arrangement if the arrangement is expressly authorized by a plan fiduciary other than the person offering the investment advice program, any person providing investment options under the plan, or any affiliate of either.

**(5) Annual audit**

The requirements of this paragraph are met if an independent auditor, who has appropriate technical training or experience and proficiency and so represents in writing—

(A) conducts an annual audit of the arrangement for compliance with the requirements of this subsection, and

(B) following completion of the annual audit, issues a written report to the fiduciary who authorized use of the arrangement which presents its specific findings regarding compliance of the arrangement with the requirements of this subsection.

For purposes of this paragraph, an auditor is considered independent if it is not related to the person offering the arrangement to the plan and is not related to any person providing investment options under the plan.

**(6) Disclosure**

The requirements of this paragraph are met if—

(A) the fiduciary adviser provides to a participant or a beneficiary before the initial provision of the investment advice with regard to any security or other property offered as an investment option, a written notification (which may consist of notification by means of electronic communication)—

(i) of the role of any party that has a material affiliation or contractual relationship with the fiduciary adviser in the development of the investment advice program and in the selection of investment options available under the plan,

(ii) of the past performance and historical rates of return of the investment options available under the plan,

(iii) of all fees or other compensation relating to the advice that the fiduciary adviser or any affiliate thereof is to receive (including compensation provided by any third party) in connection with the provision of the advice or in connection with the sale, acquisition, or holding of the security or other property,

(iv) of any material affiliation or contractual relationship of the fiduciary ad-

viser or affiliates thereof in the security or other property,

(v)[3] the manner, and under what circumstances, any participant or beneficiary information provided under the arrangement will be used or disclosed,

(vi) of the types of services provided by the fiduciary adviser in connection with the provision of investment advice by the fiduciary adviser,

(vii) that the adviser is acting as a fiduciary of the plan in connection with the provision of the advice, and

(viii) that a recipient of the advice may separately arrange for the provision of advice by another adviser, that could have no material affiliation with and receive no fees or other compensation in connection with the security or other property, and

(B) at all times during the provision of advisory services to the participant or beneficiary, the fiduciary adviser—

(i) maintains the information described in subparagraph (A) in accurate form and in the manner described in paragraph (8),

(ii) provides, without charge, accurate information to the recipient of the advice no less frequently than annually,

(iii) provides, without charge, accurate information to the recipient of the advice upon request of the recipient, and

(iv) provides, without charge, accurate information to the recipient of the advice concerning any material change to the information required to be provided to the recipient of the advice at a time reasonably contemporaneous to the change in information.

**(7) Other conditions**

The requirements of this paragraph are met if—

(A) the fiduciary adviser provides appropriate disclosure, in connection with the sale, acquisition, or holding of the security or other property, in accordance with all applicable securities laws,

(B) the sale, acquisition, or holding occurs solely at the direction of the recipient of the advice,

(C) the compensation received by the fiduciary adviser and affiliates thereof in connection with the sale, acquisition, or holding of the security or other property is reasonable, and

(D) the terms of the sale, acquisition, or holding of the security or other property are at least as favorable to the plan as an arm's length[4] transaction would be.

**(8) Standards for presentation of information**
**(A) In general**

The requirements of this paragraph are met if the notification required to be provided to participants and beneficiaries under paragraph (6)(A) is written in a clear and conspicuous manner and in a manner calculated to be understood by the average plan participant and is sufficiently accurate and

---

[3] So in original. The word "of" probably should appear.
[4] So in original. Probably should be "arm's-length".

comprehensive to reasonably apprise such participants and beneficiaries of the information required to be provided in the notification.

**(B) Model form for disclosure of fees and other compensation**

The Secretary shall issue a model form for the disclosure of fees and other compensation required in paragraph (6)(A)(iii) which meets the requirements of subparagraph (A).

**(9) Maintenance for 6 years of evidence of compliance**

The requirements of this paragraph are met if a fiduciary adviser who has provided advice referred to in paragraph (1) maintains, for a period of not less than 6 years after the provision of the advice, any records necessary for determining whether the requirements of the preceding provisions of this subsection and of subsection (b)(14) have been met. A transaction prohibited under section 1106 of this title shall not be considered to have occurred solely because the records are lost or destroyed prior to the end of the 6-year period due to circumstances beyond the control of the fiduciary adviser.

**(10) Exemption for plan sponsor and certain other fiduciaries**

**(A) In general**

Subject to subparagraph (B), a plan sponsor or other person who is a fiduciary (other than a fiduciary adviser) shall not be treated as failing to meet the requirements of this part solely by reason of the provision of investment advice referred to in section 1002(21)(A)(ii) of this title (or solely by reason of contracting for or otherwise arranging for the provision of the advice), if—

(i) the advice is provided by a fiduciary adviser pursuant to an eligible investment advice arrangement between the plan sponsor or other fiduciary and the fiduciary adviser for the provision by the fiduciary adviser of investment advice referred to in such section,

(ii) the terms of the eligible investment advice arrangement require compliance by the fiduciary adviser with the requirements of this subsection, and

(iii) the terms of the eligible investment advice arrangement include a written acknowledgment by the fiduciary adviser that the fiduciary adviser is a fiduciary of the plan with respect to the provision of the advice.

**(B) Continued duty of prudent selection of adviser and periodic review**

Nothing in subparagraph (A) shall be construed to exempt a plan sponsor or other person who is a fiduciary from any requirement of this part for the prudent selection and periodic review of a fiduciary adviser with whom the plan sponsor or other person enters into an eligible investment advice arrangement for the provision of investment advice referred to in section 1002(21)(A)(ii) of this title. The plan sponsor or other person who is a fiduciary has no duty under this part to monitor the specific investment ad-

vice given by the fiduciary adviser to any particular recipient of the advice.

**(C) Availability of plan assets for payment for advice**

Nothing in this part shall be construed to preclude the use of plan assets to pay for reasonable expenses in providing investment advice referred to in section 1002(21)(A)(ii) of this title.

**(11) Definitions**

For purposes of this subsection and subsection (b)(14)—

**(A) Fiduciary adviser**

The term "fiduciary adviser" means, with respect to a plan, a person who is a fiduciary of the plan by reason of the provision of investment advice referred to in section 1002(21)(A)(ii) of this title by the person to a participant or beneficiary of the plan and who is—

(i) registered as an investment adviser under the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.) or under the laws of the State in which the fiduciary maintains its principal office and place of business,

(ii) a bank or similar financial institution referred to in subsection (b)(4) or a savings association (as defined in section 1813(b)(1) of title 12), but only if the advice is provided through a trust department of the bank or similar financial institution or savings association which is subject to periodic examination and review by Federal or State banking authorities,

(iii) an insurance company qualified to do business under the laws of a State,

(iv) a person registered as a broker or dealer under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.),

(v) an affiliate of a person described in any of clauses (i) through (iv), or

(vi) an employee, agent, or registered representative of a person described in clauses (i) through (v) who satisfies the requirements of applicable insurance, banking, and securities laws relating to the provision of the advice.

For purposes of this part, a person who develops the computer model described in paragraph (3)(B) or markets the investment advice program or computer model shall be treated as a person who is a fiduciary of the plan by reason of the provision of investment advice referred to in section 1002(21)(A)(ii) of this title to a participant or beneficiary and shall be treated as a fiduciary adviser for purposes of this subsection and subsection (b)(14), except that the Secretary may prescribe rules under which only 1 fiduciary adviser may elect to be treated as a fiduciary with respect to the plan.

**(B) Affiliate**

The term "affiliate" of another entity means an affiliated person of the entity (as defined in section 80a–2(a)(3) of title 15).

**(C) Registered representative**

The term "registered representative" of another entity means a person described in

section 3(a)(18) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(18)) (substituting the entity for the broker or dealer referred to in such section) or a person described in section 202(a)(17) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–2(a)(17)) (substituting the entity for the investment adviser referred to in such section).

(Pub. L. 93–406, title I, §408, Sept. 2, 1974, 88 Stat. 883; Pub. L. 96–364, title III, §308, Sept. 26, 1980, 94 Stat. 1295; Pub. L. 97–354, §5(a)(43), Oct. 19, 1982, 96 Stat. 1697; Pub. L. 99–514, title XI, §1114(b)(15)(B), Oct. 22, 1986, 100 Stat. 2452, 2957; Pub. L. 101–239, title VII, §§7881(*l*)(5), 7891, 7894(e)(4)(A), Dec. 19, 1989, 103 Stat. 2443, 2445, 2450; Pub. L. 101–508, title XII, §12012(b), Nov. 5, 1990, 104 Stat. 1388–571; Pub. L. 103–465, title VII, §731(c)(4)(C), Dec. 8, 1994, 108 Stat. 5004; Pub. L. 104–188, title I, §1704(n)(2), Aug. 20, 1996, 110 Stat. 1886; Pub. L. 105–34, title XV, §1506(b)(2), Aug. 5, 1997, 111 Stat. 1066; Pub. L. 106–170, title V, §535(a)(2)(C), Dec. 17, 1999, 113 Stat. 1934; Pub. L. 107–16, title VI, §612(b), June 7, 2001, 115 Stat. 100; Pub. L. 108–218, title II, §204(b)(3), Apr. 10, 2004, 118 Stat. 609; Pub. L. 108–357, title VII, §709(a)(3), Oct. 22, 2004, 118 Stat. 1551; Pub. L. 109–280, title I, §108(a)(11), formerly §107(a)(11), title VI, §§601(a)(1), (2), 611(a)(1), (c)(1), (d)(1), (e)(1), (g)(1), 612(a), Aug. 17, 2006, 120 Stat. 819, 952, 953, 967–969, 971, 972, 975, renumbered Pub. L. 111–192, title II, §202(a), June 25, 2010, 124 Stat. 1297; Pub. L. 110–458, title I, §106(a)(1), (b)(1), Dec. 23, 2008, 122 Stat. 5106; Pub. L. 112–141, div. D, title II, §40241(b), July 6, 2012, 126 Stat. 859.)

### REFERENCES IN TEXT

This chapter, referred to in subsec. (a), was in the original "this Act", meaning Pub. L. 93–406, known as the Employee Retirement Income Security Act of 1974. Titles I, III, and IV of such Act are classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

The Investment Advisers Act of 1940, referred to in subsec. (g)(11)(A)(i), is title II of act Aug. 22, 1940, ch. 686, 54 Stat. 847, which is classified generally to subchapter II (§80b–1 et seq.) of chapter 2D of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 80b–20 of Title 15 and Tables.

The Securities Exchange Act of 1934, referred to in subsec. (g)(11)(A)(iv), is act June 6, 1934, ch. 404, 48 Stat. 881, which is classified principally to chapter 2B (§78a et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 78a of Title 15 and Tables.

### AMENDMENTS

2012—Subsec. (b)(13). Pub. L. 112–141 substituted "January 1, 2022" for "January 1, 2014" and "July 6, 2012" for "August 17, 2006".

2008—Subsec. (b)(18)(C). Pub. L. 110–458, §106(b)(1), struck out "or less" after "deviate by more".

Subsec. (g)(3)(D)(ii). Pub. L. 110–458, §106(a)(1)(A), substituted "subsection (b)(14)(A)(ii)" for "subsection (b)(14)(B)(ii)".

Subsec. (g)(6)(A)(i). Pub. L. 110–458, §106(a)(1)(B), substituted "fiduciary adviser" for "financial adviser".

Subsec. (g)(11)(A). Pub. L. 110–458, §106(a)(1)(C), substituted "a participant" for "the participant" in introductory and concluding provisions and "subsection (b)(4)" for "section 1108(b)(4) of this title" in cl. (ii).

2006—Subsec. (b)(13). Pub. L. 109–280, §108(a)(11), formerly §107(a)(11), as renumbered by Pub. L. 111–192, substituted "August 17, 2006" for "October 22, 2004".

Subsec. (b)(14). Pub. L. 109–280, §601(a)(1), added par. (14).

Subsec. (b)(15) to (19). Pub. L. 109–280, §611(a)(1), (c)(1), (d)(1), (e)(1), (g)(1), added pars. (15) to (19).

Subsec. (b)(20). Pub. L. 109–280, §612(a), added par. (20).

Subsec. (g). Pub. L. 109–280, §601(a)(2), added subsec. (g).

2004—Subsec. (b)(13). Pub. L. 108–357 substituted "October 22, 2004" for "April 10, 2004".

Pub. L. 108–218 substituted "January 1, 2014" for "January 1, 2006" and "April 10, 2004" for "December 17, 1999".

2001—Subsec. (d)(2)(C). Pub. L. 107–16 added subpar. (C).

1999—Subsec. (b)(13). Pub. L. 106–170 substituted "made before January 1, 2006" for "in a taxable year beginning before January 1, 2001" and "December 17, 1999" for "January 1, 1995".

1997—Subsec. (d). Pub. L. 105–34 amended subsec. (d) generally, substituting present provisions for provisions exempting transactions involving an owner-employee, a member of the family, or a corporation controlled by any such owner-employee through the ownership, directly or indirectly, of 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of the corporation.

1996—Subsec. (b)(1). Pub. L. 104–188 inserted at end "A loan made by a plan shall not fail to meet the requirements of the preceding sentence by reason of a loan repayment suspension described under section 414(u)(4) of title 26."

1994—Subsec. (b)(13). Pub. L. 103–465 substituted "2001" for "1996" and "1995" for "1991".

1990—Subsec. (b)(13). Pub. L. 101–508 added par. (13).

1989—Subsec. (b)(12). Pub. L. 101–239, §7881(*l*)(5), added par. (12).

Subsec. (d). Pub. L. 101–239, §7891(a)(1), in last sentence, substituted "section 401(c)(3) of the Internal Revenue Code of 1986" for "section 401(c)(3) of the Internal Revenue Code of 1954", which for purposes of codification was translated as "section 401(c)(3) of title 26" thus requiring no change in text.

Pub. L. 101–239, §7891(a)(2), in last sentence, substituted "section 408 of the Internal Revenue Code of 1986" for "section 408 of the Internal Revenue Code of 1954" and "section 408(c) of the Internal Revenue Code of 1986" for "section 408(c) of such Code" which for purposes of codification were translated as "section 408 of title 26" and "section 408(c) of title 26", respectively, thus requiring no change in text.

Pub. L. 101–239, §7894(e)(4)(A), in last sentence, substituted "individual retirement account or individual retirement annuity described in section 408 of title 26 or a retirement bond described in section 409 of title 26 (as effective for obligations issued before January 1, 1984)" for "individual retirement account, individual retirement annuity, or an individual retirement bond (as defined in section 408 or 409 of title 26)" and "section 408(c) of such Code" for "section 408(c) of such code", which for purposes of codification was translated as "section 408(c) of title 26" thus requiring no change in text.

1986—Subsec. (b)(1)(B). Pub. L. 99–514, §1114(b)(15)(B), substituted "highly compensated employees (within the meaning of section 414(q) of title 26)" for "highly compensated employees, officers, or shareholders".

Subsec. (d). Pub. L. 99–514, §1898(i)(1), struck out "(a)," before "(b)," in introductory provisions.

1982—Subsec. (d). Pub. L. 97–354 substituted "section 1379 of title 26 as in effect on the day before the date of the enactment of the Subchapter S Revision Act of 1982" for "section 1379 of title 26".

1980—Subsec. (b)(10), (11). Pub. L. 96–364, §308(a), added pars. (10) and (11).

Subsec. (f). Pub. L. 96–364, §308(b), added subsec. (f).

### EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110–458 effective as if included in the provisions of Pub. L. 109–280 to which the amend-

ment relates, except as otherwise provided, see section 112 of Pub. L. 110-458, set out as a note under section 72 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by section 108(a)(11) of Pub. L. 109-280 applicable to plan years beginning after 2007, see section 108(e) of Pub. L. 109-280, set out as a note under section 1021 of this title.

Pub. L. 109-280, title VI, §601(a)(3), Aug. 17, 2006, 120 Stat. 958, provided that: "The amendments made by this subsection [amending this section] shall apply with respect to advice referred to in section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1002(21)(A)(ii)] provided after December 31, 2006."

Amendment by section 611(a)(1), (c)(1), (d)(1), (e)(1), (g)(1) of Pub. L. 109-280 applicable to transactions occurring after Aug, 17, 2006, see section 611(h)(1) of Pub. L. 109-280, set out as a note under section 4975 of Title 26, Internal Revenue Code.

Amendment by section 612(a) of Pub. L. 109-280 applicable to any transaction which the fiduciary or disqualified person discovers, or reasonably should have discovered, after Aug. 17, 2006, constitutes a prohibited transaction, see section 612(c) of Pub. L. 109-280, set out as a note under section 4975 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 2001 AMENDMENT

Amendment by Pub. L. 107-16 applicable to years beginning after Dec. 31, 2001, see section 612(c) of Pub. L. 107-16, set out as a note under section 4975 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106-170 applicable to qualified transfers occurring after Dec. 17, 1999, see section 535(c)(1) of Pub. L. 106-170, set out as a note under section 420 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105-34 applicable to taxable years beginning after Dec. 31, 1997, see section 1506(c) of Pub. L. 105-34, set out as a note under section 409 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104-188 effective as of Dec. 12, 1994, see section 1704(n)(3) of Pub. L. 104-188, set out as a note under section 414 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1990 AMENDMENT

Amendment by Pub. L. 101-508 applicable to qualified transfers under section 420 of title 26 made after Nov. 5, 1990, see section 12012(e) of Pub. L. 101-508, set out as a note under section 1021 of this title.

#### EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by section 7881(*l*)(5) of Pub. L. 101-239 effective, except as otherwise provided, as if included in the provision of the Pension Protection Act, Pub. L. 100-203, §§9302-9346, to which such amendment relates, see section 7882 of Pub. L. 101-239, set out as a note under section 401 of Title 26, Internal Revenue Code.

Amendment by section 7891(a) of Pub. L. 101-239 effective, except as otherwise provided, as if included in the provision of the Tax Reform Act of 1986, Pub. L. 99-514, to which such amendment relates, see section 7891(f) of Pub. L. 101-239, set out as a note under section 1002 of this title.

Section 7894(e)(4)(B) of Pub. L. 101-239 provided that: "The amendments made by subparagraph (A) [amending this section] shall take effect as if originally included in section 491(b) of the Deficit Reduction Act of 1984 [Pub. L. 98-369]."

#### EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by section 1114(b)(15)(B) of Pub. L. 99-514 applicable to years beginning after Dec. 31, 1988, see

section 1114(c)(3) of Pub. L. 99-514, set out as a note under section 414 of Title 26, Internal Revenue Code.

Section 1898(i)(2) of Pub. L. 99-514 provided that: "The amendment made by paragraph (1) [amending this section] shall apply to transactions after the date of the enactment of this Act [Oct. 22, 1986]."

#### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97-354 applicable to taxable years beginning after Dec. 31, 1982, see section 6(a) of Pub. L. 97-354, set out as a note under section 1361 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96-364 effective Sept. 26, 1980, except as specifically provided, see section 1461(e) of this title.

#### REGULATIONS

Pub. L. 109-280, title VI, §611(g)(3), Aug. 17, 2006, 120 Stat. 975, provided that: "No later than 180 days after the date of the enactment of this Act [Aug. 17, 2006], the Secretary of Labor, after consultation with the Securities and Exchange Commission, shall issue regulations regarding the content of policies and procedures required to be adopted by an investment manager under section 408(b)(19) of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1108(b)(19)]."

Secretary of the Treasury or his delegate to issue before Feb. 1, 1988, final regulations to carry out amendments made by section 1114 of Pub. L. 99-514, see section 1141 of Pub. L. 99-514, set out as a note under section 401 of Title 26, Internal Revenue Code.

Secretary authorized, effective Sept. 2, 1974, to promulgate regulations wherever provisions of this part call for the promulgation of regulations, see sections 1031 and 1114 of this title.

#### APPLICABILITY OF AMENDMENTS BY SUBTITLES A AND B OF TITLE I OF PUB. L. 109-280

For special rules on applicability of amendments by subtitles A (§§101-108) and B (§§111-116) of title I of Pub. L. 109-280 to certain eligible cooperative plans, PBGC settlement plans, and eligible government contractor plans, see sections 104, 105, and 106 of Pub. L. 109-280, set out as notes under section 401 of Title 26, Internal Revenue Code.

#### COORDINATION OF 2006 AMENDMENT WITH EXISTING EXEMPTIONS

Any exemption under subsec. (b) of this section provided by amendment by section 601(a)(1), (2) of Pub. L. 109-280 not to alter existing individual or class exemptions provided by statute or administrative action, see section 601(c) of Pub. L. 109-280, set out as a note under section 4975 of Title 26, Internal Revenue Code.

#### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101-1147 and 1171-1177] or title XVIII [§§1800-1899A] of Pub. L. 99-514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99-514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

### § 1109. Liability for breach of fiduciary duty

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary